THE STATE OF OHIO, APPELLEE, *v.* WALSH, APPELLANT.

(No. 78AP-837—Decided December 18, 1979.)

*Mr. George C. Smith,* prosecuting attorney, *Mr. Alan C. Travis, Ms. Karen L. Martin* and *Mr. Richard A. Curtin,* for appellee.

*Robins, Preston & Beckett Co., L.P.A.,* and *Mr. John A. Sentz, Jr.,* for appellant.

WHITESIDE, J.   Defendant-appellant, Eugene Walsh, appeals from his conviction in the Court of Common Pleas of Franklin County of a securities violation and raises eight assignments of error, as follows:

"1. The court erred in giving a special charge offered by the prosecution which is contrary to the presumption of innocence of a defendant.

"2. The court erred in its charge by making reference to civil liability in this criminal proceeding.

"3. The court erred in not granting a new trial after allowing the prosecution to make remarks in final argument which were not only not substantiated by evidence in the record, but were contrary to the uncontroverted evidence in the record.

"4. The court erred in not granting a motion for acquittal at the close of the prosecutor's case.

"5. The court erred in not granting a motion for acquittal after the verdict of the jury.

"6. The court erred in not striking the testimony of Phil Musser who based his answers on inadmissible evidence which was not in the record.

"7. The court erred in not striking the testimony of Phil Musser for his testimony violated the best evidence rule.

"8. Section 1707.44G [*sic*] of the Ohio Revised Code is unconstitutional, being overly broad, vague and imprecise, fails to state ascertainable standards of guilt, and is so indefinite that men of common intelligence must guess at its meaning, and be uncertain as to its application."

Defendant, an attorney and a petroleum and natural gas engineer, together with a codefendant, Paul Plunket (hereinafter, "defendant" refers to Eugene Walsh), a securities salesman, formed a corporation to engage in the business of drilling oil and gas wells. They obtained an assignment of an

oil and gas lease, obtained a driller, filed a securities registration with the Ohio Division of Securities and began to sell 37 shares in the venture, representing 80 percent thereof, at a price of $5,000 each.

The registration stated that the underwriter would receive a commission in an amount equal to 15 percent of the sale price of the securities and that an amount not to exceed $8,500 of the proceeds would be used for administrative expenses. The offering circular, which, together with other documents, was given to each investor, indicated that the underwriter's commission would be 15 percent, that the proceeds from the sale of the securities would be placed in a special drilling account, that the venture was contingent upon the sale of the shares offered, that any excess of proceeds over drilling and other expenses would constitute profit to the corporation and that if the proceeds proved to be inadequate, then the remainder of the costs would be borne by the corporation. In addition, defendant and Plunket executed an agreement agreeing to purchase the necessary number of shares to complete a well if an inadequate amount of shares was sold.

Despite their efforts, only six full shares and two half shares were sold, realizing proceeds of $35,000. None of the proceeds of the sale were placed in a special drilling account; but, instead, all but $8,700 thereof was expended either for corporate purposes, including salary to defendant, or for personal use by Plunket. Being unable to sell the offerings, defendant and Plunket sold their stock in the corporation to another promoter, who assured them he could get the offerings sold. The major asset of the corporation was a certificate of stock in another corporation which was allegedly worth $30,000 and which could be converted to cash upon the exercise of an option. Defendant and Plunket sold their stock in the corporation to the promoter for only one dollar, the stock having doubtful value despite the existence of the certificate-of-stock asset, which was allegedly worth $30,000, and the $8,700 in cash—in light of the obligation to the investors. The promoter, rather than selling further shares or exercising the option of converting the certificate of stock to cash, proceeded to use the corporate funds, the $8,700 in cash, for his own personal use.

Defendant was indicted upon seven counts of grand theft, one count of a securities violation and two counts of selling

securities without being licensed. Prior to trial, the two counts of selling without a license were dismissed. The jury returned a verdict finding defendant not guilty on the seven counts of grand theft, but guilty on the one count of a securities violation.

In the eighth assignment of error, defendant contends that the statute of which he was convicted of violating is unconstitutional, namely, R. C. 1707.44(G), which provides, as follows:

"No person in selling securities shall knowingly engage in any act or practice which is, in sections 1707.01 to 1707.45 of the Revised Code, declared illegal, defined as fraudulent, or prohibited."

There are three basic elements of the offense so defined: (1) the accused must have engaged in an act or practice either (a) declared as illegal, (b) defined as fraudulent, or (c) prohibited in R. C. Chapter 1707;(2) the accused must have engaged in such act or practice knowingly; and (3) the accused must have engaged in such act or practice in selling securities.

We find that the statute is not overly broad, vague or imprecise. The fact that one must look to other provisions of R. C. Chapter 1707 to ascertain whether an act or practice is declared illegal, defined to be fraudulent or prohibited does not render R. C. 1707.44(G) unconstitutional. In addition, defendant has not identified the other provisions of R. C. Chapter 1707 which he contends are overbroad, vague or imprecise.

Unfortunately, the indictment did not allege any specific act or practice claimed to constitute the violation. However, motions for a bill of particulars and an amended bill of particulars were sustained. Although not as precise as might be desirable, the amended bill of particulars alleges that defendant engaged in "fraudulent acts" as defined by R. C. 1707.01(J). It further alleges that the registration for the securities contained false representations indicating that the corporation, Hydro-Carbon Energy Corporation (hereinafter referred to as Hydro-Carbon), had a valid oil and gas lease for certain real estate and false representations as to the net worth of the corporation. In addition, the amended bill of particulars alleges that defendant made false promises, agreeing to purchase any unsold shares so that sufficient funds would exist for commencing and completing the drilling, that defen-

dant agreed to follow a certain procedure if he sold his interest in Hydro-Carbon and that he failed to follow the procedure in selling his interest. Unfortunately, there are several references in the amended bill of particulars to alleged false representations in the registration application for purpose of securing qualification of the securities, which would constitute a violation of R. C. 1707.44(B), rather than R. C. 1707.44 (G). However, there are also allegations in the amended bill of particulars that defendant made these false representations in selling securities. It is further alleged that defendant's sale of the corporate stock for one dollar constituted a "fraudulent act" in violation of R. C. 1707.44(G).

Unfortunately, the charge of the court to the jury was only in the general terms of R. C. 1707.44(G), without reference to the specific alleged fraudulent acts which the defendant was alleged to have committed by the amended bill of particulars; and, no such specific instruction was requested by any party. However, this does not render the statute, itself, unconstitutional.

Since R. C. 1707.44(G), properly construed and applied, is not overly broad, vague, imprecise or so indefinite that men of common intelligence cannot ascertain its meaning, the eighth assignment of error is not well taken.

By the fourth and fifth assignments of error, defendant contends that the trial court erred in overruling his motions for acquittal. Defendant first contends that there was no evidence that he in any way engaged in selling securities, within the contemplation of R. C. 1707.44(G). There is merit to defendant's contention in that he was not a salesman, licensed or otherwise, of the securities, within the definition of salesman set forth in R. C. 1707.01(F)(1). However, R. C. 1707.01(C)(2) defines the term "sell" as meaning "***any act by which a sale is made." R. C. 1707.01(C)(1) defines the term "sale" to include "***a solicitation of a sale, a solicitation of an offer to buy***or an offer to sell, directly or indirectly, by agent, circular, pamphlet, advertisement, or otherwise."

There was evidence that defendant made overtures to three of the eventual purchasers of the securities of a sufficient nature that it could be found that he directly or indirectly solicited these investors to purchase shares, even though he referred them to Plunket for the actual sales. In one instance,

defendant told a potential investor about the securities and offered to have Plunket see the investor if he was interested in purchasing the securities; and, Plunket did see that investor. The record also indicates that defendant had conversations with a second investor, although the evidence would not be sufficient to justify a finding that the conversations constituted a solicitation to sell securities. However, as to a third investor, the evidence was sufficient to permit a conclusion that defendant made a solicitation to sell securities, inasmuch as defendant explained the investment to the investor and asked if he might be interested in participating; afterwards, Plunket called upon him and the purchase of the security ensued.

Thus, in at least two instances, there is evidence that defendant solicited "leads" for the actual seller of the securities. This is sufficient to constitute an act of selling, at least indirectly, in accordance with the statutory definitions and in light of his involvement in the corporation, the registration, the qualification of the securities and the preparation of the other documents. Defendant's participation was not limited to that of one friend advising another of a good investment of which he has learned or has purchased.

As noted previously, in order to constitute a violation of R. C. 1707.44(G), defendant must have engaged in a fraudulent act or practice in selling securities. Thus, the act or practice must have been one in connection with the sale of the security, rather than an act or practice committed subsequent to the sale. Thus, a promise or representation made in connection with the sale is not rendered fraudulent by the subsequent violation of the promise or by a change of circumstances; unless, at the time of the sale, there was no intention to keep the promise, or it was known that the circumstances would change. This is made apparent by R. C. 1707.01(J), which defines "fraudulent acts" or "fraudulent practices" as "***any device, scheme, or artifice to defraud or to obtain money or property by means of any false pretense, representation, or promise***and any act, practice, transaction, or course of business relating to the sale of securities which is fraudulent or which has operated or would operate as a fraud upon the purchaser."

The two sales as to which defendant could be found to

have been involved as a solicitor occurred in April and July of 1976. Since defendant caused Plunket to contact these purchasers, it is reasonable to infer that defendant knew that the offering circular and accompanying documents would be given to the purchasers by Plunket.

Defendant contends that there was no proof of the alleged fraudulent acts set forth in the amended bill of particulars. As to the validity of the assignment of the oil and gas lease to Hydro-Carbon, defendant contends that there is no evidence indicating that the assignment was invalid. It does appear that there was an assignment of the lease to Hydro-Carbon, even though it was not recorded. While the state contends that there was no consideration given for the assignment, Hydro-Carbon did enter into an agreement with the assignor of the lease, as contractor, to drill two test wells for a total price of $70,000. The drilling of the first well was to commence within 60 days after execution of the agreement and deposit of $35,000 in a special drilling account. Nevertheless, it is apparent that the oil and gas lease expired in September of 1976 and was not renewed by Hydro-Carbon. The lease was, however, renewed by the assignor who eventually drilled a successful well on the property in 1977 for another developer. Accordingly, in April and July of 1976, a valid oil and gas lease was in existence. However, by the participation agreement executed by Hydro-Carbon and each investor, Hydro-Carbon agreed to commence or cause to be commenced operations for drilling of the two test wells within 180 days. Accordingly, there was an obligation on the part of Hydro-Carbon to renew the lease if the drilling was not commenced prior to expiration of the lease. Accordingly, there was an issue as to whether defendant knew that the lease would not be renewed by Hydro-Carbon, itself, at the time of the solicitation.

As to the net worth of Hydro-Carbon, we find insubstantial evidence that it was fraudulently misstated or that the investors relied upon representations as to net worth. As to the personal written commitment by defendant to purchase unsold working interests in the well, this commitment was to purchase sufficient units to assure completion of the well. The offering circular expressly provided, in paragraph 31, that the drilling of the well was dependent upon sale of the interest offered by the offering circular. However, even assuming that

defendant undertook an obligation to purchase sufficient shares to assure both the commencement and completion of the drilling of the wells, in order to constitute fraud in selling the securities, it would be necessary to prove both that the investors relied upon this commitment as an inducement and that defendant had no intention at the time of the solicitation to fulfill his commitment—which may under proper circumstances be inferred from the surrounding circumstances, including the fact that he did not do so.

As to the sale by defendant of his stock in Hydro-Carbon, it is difficult to conceive of any basis for this constituting fraud in selling securities. Paragraph 11 of the operating agreement did not bind defendant to notify the investors if he sold his stock in Hydro-Carbon, but, instead, obligated Hydro-Carbon to notify the investors if Hydro-Carbon determined not to continue as operator. Moreover, the fact that only one dollar was received for the stock does not constitute fraud in selling the securities, even assuming that defendant's actions, in selling his stock in Hydro-Carbon, constituted fraud upon the investors. There is no evidence from which it could reasonably be inferred that defendant, at the time the securities were sold, planned to take the steps that he subsequently did with respect to sale of his stock.

The state refers to evidence of other acts which it apparently considered fraudulent. It is pointed out that paragraph 27 of the offering circular states that drilling will begin by April 1, 1976. However, inasmuch as all of the sales were made after that date and inasmuch as investors were aware that drilling had not commenced, since the offering itself provided that it would expire upon the commencement of drilling, this statement concerning the drilling date could hardly be deemed a fraudulent act or practice in selling securities within the contemplation of R. C. 1707.44(G).

More significantly, the state points out that none of the proceeds of the sale of the working interest securities were deposited in a special drilling fund in accordance with paragraph 35 of the offering circular and that no funds were deposited in a drilling account in Park National Bank in accordance with the turnkey drilling and completion agreement.

However, the subscription agreement of the investors

refers only to the offering circular, participation agreement, operating agreement and synopsis sheet as being furnished to the investors; and, it is unclear as to whether the investors were given a copy, or advised of the contents, of the turnkey agreement or of the commitment of defendant to purchase unsold units "required to pay for the drilling and completion of the wells," as reflected in the registration of the securities which was submitted to the Division of Securities. Nevertheless, even assuming that there was no immediate obligation to deposit the funds in the Park National Bank, there was a representation that the proceeds of the sale of the securities would be deposited in a special drilling fund. This was not done. However, defendant is correct that it was not contemplated that all of the proceeds would be deposited in the special drilling fund, inasmuch as the offering circular also indicated that a commission of 15 percent would be paid, which is consistent with R. C. 1707.09(J).

Accordingly, 85 percent of the proceeds should have been deposited in a special drilling fund. Instead, all but $8,700 of the proceeds were utilized either for corporate expenses or as advances to Plunket. Obviously, the corporation was not entitled to the entire commission from the first sales, but such commissions would be paid as earned. We, likewise, find no merit to the contention of the state that no commission could be paid prior to the sale of all of the securities offered since there is nothing in any of the filings, or the agreement or in R. C. 1707.44(G), precluding payment of commissions as they accrue. Even assuming that it would be appropriate to deduct administrative costs from the proceeds of the sale of the stock, it was stated in the application for qualification that administrative costs would not exceed $8,500. In addition, in the budget estimate given to each investor, it was indicated that the estimate of the cost per well was $92,500, including $35,000 for drilling, $35,000 for completion, $13,875 for commission and $8,625 for cash compensation.

Accordingly, there is evidence in the record that the proceeds of the sales were diverted to corporate purposes, that no special drilling fund was created and that defendant was aware of these facts. In addition, paragraph 10 of the participation agreement provides, in part, that:

"***In the event adequate financial support from In-

vestors is not obtained to drill the above described exploratory wells, Hydro-Carbon may refund the amount listed in paragraph (2) above to Investors and thereupon this agreement shall be null and void and neither Hydro-Carbon nor Investor shall be subject to any liability hereunder."

Although an option is given Hydro-Carbon by paragraph 10, *supra,* one of the purposes of the special drilling fund is to assure that at least a substantial portion of the investor's investment will be available for this refund if a well was not drilled.

Accordingly, there was sufficient evidence from which the jury could find that defendant committed fraudulent acts or practices in selling the securities, both with respect to the representations as to the continued validity of the oil and gas lease and as to the failure to deposit at least a substantial portion of each investment in a special drilling fund. Accordingly, the fourth and fifth assignments of error are not well taken.

In the first assignment of error, defendant contends that the trial court erred in charging the jury that:

"The Securities Act expressly provides that in any prosecution under it the accused shall be deemed to have had knowledge of any matter of fact, where in the exercise of reasonable diligence he should, prior to the alleged commission of the offense in question, [have] secured such knowledge."

This charge follows the language of R. C. 1707.29. However, defendant contends that this jury charge is contrary to the presumption of innocence of the defendant, in effect creating a presumption of knowledge. Although we agree with the state that R. C. 1707.29 does not create a presumption, even if the statute is construed to create a presumption, it would not constitute a mandatory or conclusive presumption but, instead, a permissive or rebuttable presumption, which does not ordinarily infringe upon the presumption of innocence or in any way shift the burden of proof to the defendant. See *County Court of Ulster County* v. *Allen* (1979), 442 U. S. 140. The trial court expressly so instructed the jury, stating:

"If the Defendant had an honest belief in the existence of such facts and acted in accordance of the facts as he believed

them to be, he is not guilty of selling securities fraudulently, as knowledge is an essential element of that crime.***"

On the other hand, we cannot accept the state's contention that R. C. 1707.29, instead of creating a presumption, eliminates the element of scienter or knowledge with respect to matters defendant should have learned. Rather, although R. C. 1707.44(G) utilizes the word "knowingly," R. C. 1707.29 has the general effect of defining "knowingly" more in terms of "negligently" as defined by R. C. 2901.22(D), rather than "knowingly" as defined by R. C. 2901.22(B). Thus, for the purpose of fraudulent acts in selling securities in violation of R. C. 1707.44(G), a person is criminally liable if he represents facts to be different than he should have known them to be if he had exercised reasonable diligence to ascertain the facts. On the other hand, of necessity, a good-faith belief in the existence of the fact as represented creates no criminal liability, since one cannot have a good-faith belief in facts which he should know to be otherwise had he exercised reasonable diligence. Good faith necessarily implies the exercise of reasonable diligence to ascertain the true state of facts.

There remains, however, a very important issue for the jury to determine, *i.e.*, whether the defendant should have learned the true nature of the facts in the exercise of reasonable diligence. First, it must be ascertained whether the defendant exercised reasonable diligence to ascertain the true state of facts; and, second, it must be determined whether he should, not merely could, have learned of the true facts in the exercise of reasonable diligence. This is not a situation where one fact is presumed to exist because of the existence of another; but, instead, in the context of this case, the jury is required to make a factual determination of whether the defendant represented the facts to be different than he should have known them to be, in the exercise of reasonable diligence. This in no way infringes upon the presumption of innocence, since the state is required to prove, beyond a reasonable doubt, that the defendant in the exercise of reasonable diligence should have known the facts to be different than he represented them to be. Actually, there is little difference between this standard and the standard that is ordinarily used, since it is permissible to infer

that a defendant has knowledge of facts which he should have known under the circumstances involved. Accordingly, the first assignment of error is not well taken.

By the second assignment of error, defendant contends that the trial court erred in charging the jury as to the purpose of the Ohio Securities Act, R. C. Chapter 1707. In this regard, the trial court charged the jury, as follows:

"In the eighth Count of the indictment, it is alleged that Gene Walsh, Paul Plunket and Chester Plunket, in selling securities, did knowingly engage in acts or practices which have been declared or which have been defined as fraudulent.

"As I have stated before, you are to consider the case against each Defendant separately. Before you can find the Defendants or any of them guilty, you must find beyond a reasonable doubt first, that between the dates of April 20, 1976, and December 15, 1976, in the County of Franklin and State of Ohio, the Defendants by means of fraudulent acts knowingly did sell securities, to wit: oil and gas interests.

"Now, the Defendants are charged in violating the Ohio Securities Act. This act is sometimes properly called the Blue Sky Law. The purpose of this act is to regulate the sale of securities and to protect members of the public from loss that may be caused by fraud, or by wasteful incompetence, ignorance, inexperience or poor business judgment both of promoters and investors. The State recognizes that many people are not qualified to protect themselves in choosing investments in securities, and seeks to protect them by the Securities Act. In general, this act lays down certain requirements which must be followed when the securities are sold in Ohio.

"The Securities Act seeks to protect the public in two ways, namely: By requiring that any person who sells securities in Ohio must, prior to a lawful sale, be licensed by the Division of Securities as a security dealer or salesman, unless the securities are of a certain type and character or unless the sales transaction is of a certain type and character, and by requiring that, before securities can be lawfully offered for sale, they must be registered with the Division of Securities, unless such securities are themselves exempt from registration or are the subject matter of a transaction which is exempt from registration."

The court then proceeded to define certain terms used in R. C. Chapter 1707, including person, sale, fraudulent acts or fraudulent practices and knowingly. The trial court gave no further definitive instruction to the jury as to the elements of engaging in fraudulent acts or practices in selling securities.

The last two paragraphs of the above-quoted charge were specifically objected to by defendant, although in his brief herein he alludes only to the first of the two paragraphs.

This charge did not set forth any issue which was properly before the jury. As stated by Justice Herbert in *State* v. *Cox* (1975), 42 Ohio St. 2d 200, at page 207:

"Charges to the jury upon the law of a case should be confined to a charge of the law upon those material issues of fact which the evidence tends to establish. No such charge should be given unless there is evidence of record which supports and requires it. See *State* v. *Linder* (1907), 76 Ohio St. 463, 81 N. E. 753; *Bandy* v. *State* (1921), 102 Ohio St. 384, 131 N. E. 499***."

The charge in question should not have been given since it did not relate to material issues of fact and since there was no evidence of record either supporting or requiring the giving of the charge. Also, as noted by Justice Celebrezze in *State* v. *Sargent* (1975), 41 Ohio St. 2d 85, 92, a charge which is of no possible help to the jury and which might well be confusing should not be given. Applying these standards, we conclude that the trial court erred in charging upon the nature and purpose of the Blue Sky Law (R. C. Chapter 1707). Instead, the trial court should have charged upon the specific elements of the offense with which defendant was charged, namely, a violation of R. C. 1707.44(G).

Although the trial court gave a charge using the general language of the statute, as set forth in the first paragraph of the above quotation, the court did not amplify that charge except by the objected-to instruction and by the definition of certain terms. The erroneous giving of the objected-to instruction could well have been confusing to the jury since it purported on its face somehow to relate to the offense with which defendant was charged, indicating to the jury that it should use this standard in determining defendant's guilt or innocence, especially in the absence of a more definitive instruction as to the elements of the offense and the issues of

fact to be determined by the jury. The only element of the offense specifically referred to by the trial court was with respect to securities, the court instructing the jury that the working interests in the oil well which were sold constituted securities as a matter of law. The court did not give the jury any guidelines as to what acts or practices of defendant were claimed to be fraudulent and, thus, were to be considered in determining whether defendant violated R. C. 1707.44(G). Thus, the jury was left to consider any act or practice of defendant which might fall within the purview of the purpose of the Ohio Securities Act, as charged by the trial court.

The charge was probably confusing to the jury since the trial judge, at the inception of the charge, instructed the jury that he was giving it the law that it should apply to the case and that the jury was required "to apply the law as it is given to you." The trial court thus expressly instructed the jury that it was to apply the extraneous instruction, as to the nature and purpose of the Ohio Securities Act, in determining the issues in the case. Since the instruction did not have any proper application to the issues in the case, the jury could not have been otherwise than confused, especially since it was not given more definite instructions as to the elements of the offense and as to what it was to consider in determining whether those elements had been proved by the evidence. Accordingly, the second assignment of error is well taken.

By the third assignment of error, defendant contends that improper argument by the prosecutor, in his closing argument, necessitates a new trial. The prosecutor's statement concerns an asset of Hydro-Carbon, *i.e.,* stock in Commonwealth Properties; Plunket had subordinated his interest in that stock to Hydro-Carbon. Defendant contended that this stock constituted an asset of Hydro-Carbon having a value of $30,000. The evidence indicated that the Ohio State Investment Group, of which William Quinn, a stockbroker, was president and sole stockholder, had entered into an agreement with Plunket, providing that upon Plunket's request Ohio State Investment Group would purchase up to 20,000 shares of Commonwealth Properties stock at a price of $1.50 a share. This commitment was originally binding until August 1, 1976, but, later, was extended until December 31, 1976. The evidence indicates that Quinn and his corporation

were solvent and were ready, willing and able to purchase the Commonwealth Properties stock from Hydro-Carbon for a total price of $30,000; further, Quinn testified by deposition that the stock had a greater value at the time. For whatever reason, neither Hydro-Carbon nor Plunket exercised this option to sell, and the Commonwealth Properties stock was not transferred with the corporate assets when the corporation was sold by Plunket and defendant. There was no evidence, indication or reasonable inference that the stock could not be converted into at least $30,000 cash by exercise of the option to sell to Quinn's corporation.

Nevertheless, the prosecutor, in his closing argument, stated the following in his argument to the jury with respect to the stock and the option to sell: "***Why didn't they cash it in? Why didn't they cash it in? They didn't cash it in because the stock was worthless." Defendant objected, but the trial court did not rule on the objection, merely stating, "That's for the jury to determine."

The argument was improper since there was no evidence supporting an inference that the stock was worthless. Even the state's own witness, an examiner with the Ohio Division of Securities, testified that the stock had a market value of $32,000 at the time he made an audit of Hydro-Carbon; however, he could not recall the specifics of how he obtained the market value of the stock. On the other hand, an officer of a bank testified that the bank would not accept the stock as collateral, but, gave no indication or opinion that the stock was worthless.

Nevertheless, standing alone, we cannot find that this unsupported statement by the prosecutor in closing argument so substantially affected defendant's right to a fair trial that the judgment should be reversed solely for this reason. The trial court did indicate that the jury was to determine the issue and instructed the jury that the closing statements of counsel do not constitute evidence. In light of the overwhelming evidence to the contrary, it is extremely questionable whether the jury could have been misled into thinking that the stock was worthless by the erroneous statement of the prosecutor to that effect. Accordingly, the third assignment of error is not well taken.

By the sixth assignment of error, defendant contends

that the trial court erred in overruling a motion to strike the testimony of a state witness, an attorney who had been previously employed by the Ohio Division of Securities. The trial court permitted this witness to testify as an expert as to the law insofar as the construction of the meaning of certain statements in the offering circular. This was clear error. Although under special circumstances an expert may testify as to the meaning of words of art used in a document, the construction of such a document is ordinarily a question of law for the trial court. Here, the trial court permitted a witness to perform the trial court's function of determining the legal significance of certain statements in the offering circular. Not only was it error to permit such type of expert testimony, but in some instances the conclusion of law reached by the expert was erroneous. In effect, the trial court permitted this expert witness to give the jury the instruction as to the law to be applied to certain portions of the offering circular, placing a reviewing court in the position of being required not only to determine whether the trial court erred in stating the law to the jury but also to determine whether the expert witness erred in instructing the jury as to the law. Obviously, the testimony should not have been admitted.

Much of the testimony of the witness, of course, was admissible since it related to an audit he had made of the checking account of Hydro-Carbon. His legal opinions, however, should not have been admitted.

The testimony involved herein did not explain the meaning of technical terms, phrases or words of art. Rather, it involved the interpretation of the offering circular, which necessarily involved construction of the circular as a whole and which involved the rendering of a legal opinion as to its meaning. This is the function of the trial court, not an expert witness.

Although parol evidence may be admissible to explain ambiguous provisions of a contract, such evidence does not include a legal opinion by an attorney; but, rather, parol evidence consists of evidence of the surrounding circumstances involving the creation of the document so as to ascertain the intent of the parties to such a document. Here, the offering circular became part of the contract between the investor and Hydro-Carbon. While the impression and

understanding conveyed by the language of the circular to the investor is of primary importance, the expert's testimony did not bear upon this issue; but, rather, the expert's opinion addressed very technical legal issues, apparently predicated in large part upon matters that were not in the record, since in some instances the legal opinion rendered was contrary to the apparent, plain meaning of the language. Accordingly, the sixth assignment of error is well taken.

The seventh assignment of error relates to the testimony of the same expert, defendant contending that his testimony violated the best evidence rule. Inasmuch as the offering circulars were in evidence, it would be unnecessary for any oral testimony concerning either the content thereof or the meaning thereof, with the possible exception of testimony explaining technical terms or words of art or testimony as to the surrounding circumstances, in order to ascertain the intent of the parties as to ambiguous language in the offering circular. However, although we have found that the trial court erred in admitting and refusing to strike the testimony of the expert, the basis for such conclusion is not the best evidence rule since the best evidence was in evidence. Accordingly, the seventh assignment of error is not well taken.

For the foregoing reasons, the first, third, fourth, fifth, seventh and eighth assignments of error are overruled, but the second and sixth assignments of error are sustained. The judgment of the Court of Common Pleas of Franklin County is reversed, and this cause is remanded to that court for further proceedings in accordance with law, consistent with this decision.

*Judgment reversed and*
*cause remanded.*

STRAUSBAUGH, P. J., and MOYER, J., concur.