**CHILES, Dir., et al., Appellees and Cross–Appellants,**

v.

**M.C. CAPITAL CORPORATION et al., Appellants and Cross–Appellees.**

[Cite as *Chiles v. M.C. Capital Corp.* (1994), 95 Ohio App.3d 485].

Court of Appeals of Ohio,
Franklin County.

No. 93API09–1317.

Decided May 31, 1994.

486

*Lee Fisher,* Attorney General, *Daniel A. Malkoff* and *Gregg H. Bachmann,* Assistant Attorneys General, for appellees and cross-appellants.

*Lyman Brownfield,* for appellant and cross-appellee Wayne Meadows.

*Jones, Day, Reavis & Pogue, John W. Zeiger* and *Katherine B. Jenks,* for *amicus curiae,* Emens, Kegler, Brown, Hill & Ritter Co., L.P.A.

PEGGY BRYANT, Judge.

Defendants-appellants, M.C. Capital Corp. and Wayne Meadows, appeal from a judgment of the Ohio Court of Claims in favor of plaintiffs-appellees, Nancy Chiles, Director of the Ohio Department of Commerce, and Mark V. Holderman, Commissioner of the Ohio Division of Securities (collectively, "ODS"), who found that defendants sold unregistered securities in Premier Broadcasting Company ("Premier") in violation of R.C. 1707.44(C)(1) and enjoined defendants from further activities in violation of that provision.

Premier is an Ohio corporation which operates a low power television station in Columbus known as Channel 62, WCLS–TV. Organized on February 26, 1992, Premier has been in the early stages of development since that time. On December 9, 1992, Premier filed a "Form 6(A)(1) Application," pursuant to R.C. 1707.06(A)(1), with the Ohio Division of Securities to register the sale of fifty "units" of Premier securities, each unit containing one share of Premier preferred stock at a designated value of $1,000 per share, one share of Premier common

stock at a designated value of $3 per share, and three "Class A" warrants, each of which could be converted into one share of Premier common stock at an exercise price of $1,250.

From December 18, 1992 to January 13, 1993, Premier sold the fifty units to sixteen individual investors. On January 19, 1993, after completing the sale, Premier declared a one thousand to one forward stock split. As a result, the securities sold as part of the unit offering totaled fifty thousand preferred shares, fifty thousand common shares and one hundred fifty thousand warrants; each of the original units thus contained one thousand shares of preferred stock, one thousand shares of common stock and three thousand warrants, each warrant bearing an exercise price of $1.25.

M.C. Capital is a small intrastate penny stockbroker/dealer whose president and sole shareholder is Wayne Meadows. M.C. Capital frequently sells stock in small Ohio companies that are start-up ventures, and attempts to create a market for shares in such companies by purchasing stock for its own account and selling the stock to prospective penny stock investors. Don Francill, Meadow's social and business acquaintance, held stock in Premier and informed Meadow of the Premier unit offering.

After investigating the initial offering, M.C. Capital engaged in a series of transactions involving the "short" sale [1] of Premier common stock. Specifically, between mid-January and January 29, 1993, M.C. Capital telephoned potential buyers to gauge interest in Premier common stock, representing that about one hundred fifty thousand shares of Premier common stock would be available at between $3 and $5 per share. On January 29, 1993, after concluding that sufficient demand existed to support M.C. Capital's engaging in "short" sale transactions in Premier stock, M.C. Capital contacted and received commitments from a number of the holders of the original Premier units to sell their warrants for $.50 each. Between January 29 and February 4, 1993, M.C. Capital then solicited orders for seventy-three thousand five hundred shares of Premier common stock at $5 per share. After gaining these stock subscriptions, M.C. Capital purchased sixty thousand warrants from the unit holders. At the time of the present litigation, M.C. Capital had exercised thirty-two thousand five hundred of its acquired warrants and had twenty-seven thousand five hundred remaining to be exercised. Because M.C. Capital acquired each warrant for $.50 and paid only $1.25 to convert each warrant into a share of common stock, it

---

1. A "short" sale is a speculation technique whereby a seller enters into a contract to sell a specified security, at a specified price, which security the seller does not own at the time of entering into the contract. *Provost v. United States* (1926), 269 U.S. 443, 450–451, 46 S.Ct. 152, 153, 70 L.Ed. 352, 354.

realized a profit of $3.25, or sixty-five percent of the $5 selling price, on each share of common stock it sold.

On March 1, 1993, ODS filed an action against defendants in the Franklin County Court of Common Pleas alleging that defendants violated R.C. Chapter 1707 *et seq.*, by selling unregistered securities. ODS sought an injunction against the further sale of securities, as well as the appointment of a receiver. Defendants counterclaimed against ODS, and the case was removed to the Ohio Court of Claims.

At trial, neither party disputed that the securities were unregistered; the issue was whether the sale of the securities was exempt. In its decision, the trial court concluded that the stock sales were not exempt from the registration requirements of R.C. Chapter 1707 because the stock was not "issued and outstanding" prior to being sold, as required by R.C. 1707.03(M). Additionally, the court concluded that even if the stock be deemed "issued and outstanding," it was not exempt from registration because fewer than twenty-five beneficial owners of Premier common stock existed at the time of the sales. See R.C. 1707.03(M)(2).

Defendants appeal, assigning the following six errors:

"I. The court below erred to the prejudice of appellants by finding that the words 'issued and outstanding' contained in R.C. 1707.03(M) relates [*sic*] to specific securities being sold rather than to the class of securities being sold.

"II. The court below erred to the prejudice of appellants by finding that shares sold 'short' by an Ohio licensed broker dealer must be 'tracked' to insure that shares delivered or covering such short sale are issued and outstanding at the time of sale for the exemption contained in R.C. 1707.03(M) to be applicable to such sale.

"III. The court below erred to the prejudice of appellants by finding Premier Broadcasting Company, Inc. did not have more than twenty-five beneficial owners prior to January 20, 1993.

"IV. The court below erred to the prejudice of appellants by finding that appellants sold stock in violation of R.C. 1707.44(C)(1) although appellees failed to meet their burden of proof.

"V. The court below erred to the prejudice of appellants by granting injunctive relief to appellees against the manifest weight of the evidence.

"VI. The court below erred in entering a judgment against Wayne Meadows individually."

ODS cross-appeals, assigning a single error:

"The trial court committed reversible error by holding that R.C. 1707.03(M)(1) would not defeat a claim of exemption from registration requirements if appel-

lants exercised Premier warrants prior to selling the underlying shares to the public."

Defendants' first and second assignments of error will be addressed together, as both challenge the trial court's conclusion that the securities defendants sold were not "issued and outstanding" at the time of sale for purposes of the transactional exemption from registration provided in R.C. 1707.03(M).

Generally, under R.C. 1707.44(C)(1), the sales of unregistered securities is prohibited, unless the securities are exempt from registration. In this case, the exemption set forth in R.C. 1707.03(M) is implicated, and its applicability is disputed by the parties. R.C. 1707.03(M) provides:

"A sale by a licensed dealer, acting either as principal or as agent, of securities issued and outstanding before such sale, is exempt, unless such sale [falls into] one or more of the following [exceptions.]"

While the term "issued and outstanding" is not defined in the Ohio Revised Code, some guidance concerning its meaning is provided in the separate definitions of the terms "issued" and "outstanding" in the context of securities law.

Issued stock generally is that part of a corporation's authorized stock that has been distributed to the public, while outstanding stock is that portion of the issued stock which remains in the hands of the public. The critical distinction between the two is that treasury stock may be included in issued stock, but not in outstanding stock. 11 Fletcher, Encyclopedia of the Law of Private Corporations (Perm.Ed.1986) 22, Section 5082; Black's Law Dictionary (6 Ed.Rev.1990) 1416, 1417; *Brumfield v. Horn* (Ala.1989), 547 So.2d 415, 417–418; *Nerken v. Std. Oil Co.* (C.A.D.C.1987), 810 F.2d 1230, 1232.

■ Defendants assert that the trial court misconstrued R.C. 1707.03(M) as including an additional requirement that each individual security be "issued and outstanding" prior to its sale by a dealer; that, to the contrary, the provision requires only that the class of securities be "issued and outstanding" prior to the sale of any individual security of that class; that since Premier common stock was an issued and outstanding class of securities when M.C. Capital began soliciting orders for such stock, the trial court's definition of "issued and outstanding" is incorrect.

■ Under established rules of statutory interpretation, a court must look to the language of the statute itself to determine legislative intent. *Shover v. Cordis Corp.* (1991), 61 Ohio St.3d 213, 574 N.E.2d 457. If the language of the statute is clear and unambiguous, the court must give effect to those words and may not modify the statute by inserting words not used. *Id.*

Despite defendants' contentions that the exemption contained in R.C. 1707.03(M) was intended to cover a class of securities, the language of the statute refers only to "securities." Thus, under the foregoing standards of statutory construction, the exemption in R.C. 1707.03(M) may not be construed to require only that the class of securities being sold be "issued and outstanding." Had the legislature so intended, it easily could have used the more permissive language. Indeed, in other sections of R.C. Chapter 1707, the legislature specifically refers to a "class" of securities or shares where it intended such a result. See R.C. 1707.03(M)(2), 1707.03(M)(3)(b), 1707.03(N). Given the legislature's failure to include similar language in R.C. 1707.03(M), the exemption provided by that provision is intended to apply only where the individual security being sold is "issued and outstanding."

■ Defendants next contend that the trial court's holding places a burden on security dealers which the legislature did not intend and which will have a chilling effect on the secondary market for penny stocks.

Holding that defendants' sale of securities was illegal because the shares were not issued and outstanding at the time they were "sold," the trial court apparently assumed that the "sales" took place at the time defendants solicited buyers for the stock sold. Arguably, however, the actual "sales" in this case, or in any case involving a short sale, did not occur until the dealer delivered the stock to its buyer, by which time the stock was issued and outstanding, having been issued by Premier to defendants upon their exercise of the warrants.

Under R.C. Chapter 1707, however, such an argument fails due to the definition of "sale" contained in R.C. 1707.01(C)(1), which provides that a "sale" includes:

" * * * a contract to sell, an exchange, an attempt to sell, an option of sale, a solicitation of a sale, a solicitation of an offer to buy, a subscription, or an offer to sell, directly or indirectly, by agent, circular, pamphlet, advertisement, or otherwise."

Given such an expansive definition of "sale," the trial court was correct in concluding that the sales in this case occurred each time defendants solicited a buyer for Premier common stock.

While defendants correctly argue that under the trial court's holding, securities dealers in Ohio are prohibited from "covering" short sales with unregistered securities which were not issued and outstanding at the time of the "sale," we cannot agree that the burden is one not intended by the legislature in view of the statutory language the legislature employed. Indeed, given the language of R.C. 1707.03(M), which differs significantly from comparable provisions of the federal securities laws, the legislature apparently intended that a dealer who engages in

short sales of stock must "track" the stock obtained to cover such a sale, whether obtained, as here, through the exercise of warrants or options, or as is the more common practice, in the secondary market,[2] to be certain that any unregistered shares were issued and outstanding at the time of the "sale." As a practical matter, the language the legislature used in the statute may cause those who sell securities to refrain from engaging in short sales due to the difficulty in determining the date of issue or registration status of a security trading in the secondary market, see Hicks, Exempted Transactions Under the Securities Act of 1933 (1 Ed.1994), Section 12.07; and if such "short" sales are common, the overall market for penny stocks may be affected.

■ Defendants also argue that the "tracking" requirement imposed by the trial court's decision contravenes the fungibility doctrine. R.C. 1308.06(A) (Uniform Commercial Code [UCC] Section 8–107), which governs the fungibility doctrine as it relates to "short" sales, provides:

"Unless otherwise agreed and subject to any applicable law or regulation respecting short sales, a person obligated to transfer securities may transfer any certificated security of the specified issue in bearer form or registered in the name of the transferee or indorsed to him or in blank, or he may transfer an equivalent uncertificated security to the transferee or a person designated by the transferee."

■ R.C. 1308.06(A) thus permits a person obligated to transfer securities, such as a person engaging in a "short" sale, to cover the obligation by selecting any security of the proper issue and in appropriate form from the bulk of securities in the market, rather than requiring the person to transfer a particular security. See Official Comment 1 to UCC 8–107. All securities of the same issue, whether certificated or uncertificated, are deemed to be fungible. See Official Reasons for 1977 Change to UCC 8–107, 2C U.L.A. 35 (Master Ed.1991); see, also, R.C. 1301.01(Q) (UCC 1–201[17]) (a security is "fungible" when, by nature or usage of trade, it is the equivalent of any other like security). Defendants assert that the trial court's decision violates the fungibility doctrine by requiring securities dealers to select only those securities which were issued and outstanding at the time of the "sale" from an otherwise fungible bulk whenever they engage in "short" sales.

Initially, issues related to R.C. 1308.06(A) and fungibility are separate and distinct from the question of whether defendants complied with the provisions of

---

**2.** The secondary market in securities involves the buying and selling of securities after their original issue to the public in the primary market. Black's Law Dictionary (6 Ed.Rev.1990) 1351. "Proceeds of secondary market sales accrue to selling investors not to the company that originally issued the securities." *Id.*

R.C. Chapter 1707 in selling Premier common stock. R.C. Chapter 1308, of which R.C. 1308.06(A) is part, is not a "Blue Sky" law and is not intended to regulate public securities offerings. See Official Comment to UCC 8–101, 2C U.L.A. 280 (Master Ed.1991). Rather, R.C. Chapter 1308 simply sets forth rules regarding the negotiability or transferability of securities. *Id.* Thus, an issuer may transfer securities which comply with the negotiability requirements of R.C. 1308.06, but nonetheless violate securities laws for lack of registration or exemption.

Furthermore, R.C. 1308.06(A) specifically provides that its fungibility rules are "subject to any applicable law or regulation respecting short sales." Since R.C. 1707.44(C)(1)'s prohibition on the sale of unregistered, non-exempt securities and R.C. 1707.03(M)'s issued-and-outstanding requirement arguably are "laws respecting short sales" in Ohio, these provisions supersede the fungibility rules of R.C. 1308.06(A). However, even if the cited sections of R.C. Chapter 1707 are not laws "respecting short sales," they are special provisions governing the sale of unregistered securities, and they control in these circumstances over the more general rules of fungibility, given the lack of a manifest legislative intent that the general provisions of the fungibility doctrine take precedence. See R.C. 1.51; *State v. Volpe* (1988), 38 Ohio St.3d 191, 527 N.E.2d 818.

Defendants' first and second assignments of error are overruled.

■ In their third assigned error, defendants allege that the trial court erroneously concluded that, even if the stock defendants sold was issued and outstanding, the transaction was not exempt under R.C. 1707.03(M) because fewer than twenty-five beneficial owners of Premier common stock existed at the time defendants sold the stock.

Although R.C. 1707.03(M) generally provides an exemption for secondary market transactions of unregistered, issued and outstanding securities, R.C. 1707.03(M)(1), (2) and (3) provide three exceptions to the exemption. R.C. 1707.03(M)(2) in particular provides that the exemption provided by R.C. 1707.03(M) does not apply to:

"Any class of shares issued by a corporation when the number of beneficial owners of such class is less than twenty-five, with the record owner of securities being deemed the beneficial owner for this purpose, in the absence of actual knowledge to the contrary[.]"

Under R.C. 1707.03(M)(2), in the absence of evidence to the contrary, the record owner of a security is deemed to be its beneficial owner for the purposes of determining the number of beneficial owners. The trial court noted that the best evidence of record ownership in the present case was the share journal kept by Premier, and that the share journal revealed fewer than twenty-five beneficial

owners of Premier common stock at the relevant times. Defendants acknowledge that beneficial ownership of stock can generally be equated with record ownership; however, they contend that for two reasons the share journal did not accurately reflect beneficial ownership of the various shares of Premier common stock.

Initially, defendants assert that the share journal fails to reflect the fact that the beneficial owners of the shares for which Robert J. Baker is record owner are two independent trusts, a self-employment retirement trust and an employee profit-sharing plan, on whose behalf Baker purchased the stock. Next, defendants argue that three of the record owners of Premier common stock listed in the share journal shared investment and voting power with their spouses, resulting in the spouses' becoming additional beneficial owners of the stock pursuant R.C. 1707.01(AA), which provides that "[a] person shall be deemed the beneficial owner of any security beneficially owned by * * * [one's] spouse * * *." Thus, defendants contend that twenty-eight beneficial owners of Premier common stock existed at the time of the sales in question, and that the sales therefore did not violate R.C. 1707.03(M)(2).

As to defendants' first contention, although Baker signed separate subscription agreements for two trusts, Baker was the only individual participating in either trust. Under these circumstances, the trial court properly could conclude that, despite the existence of the separate trust instruments, only one beneficial owner existed because only Baker actually had any rights to the Premier stock held in the trusts. Defendants' second contention suffers from similar problems. Although defendants' witnesses at trial testified that three of the record owners shared voting and investment powers with their spouses, defendants did not support the testimony with any documentation; in fact, the testifying witnesses admitted on cross-examination that such documentation did not exist. Therefore, the trial court legitimately could have rejected defendants' joint ownership claims based on a lack of credible evidence.

Further, to the extent defendants contend that R.C. 1707.01(AA)'s definition of "beneficial owner" mandates the conversion of three record owners into six owners simply because the record owners had spouses, we disagree. While R.C. 1707.01(AA) provides the general definition of "beneficial owner" applicable throughout R.C. Chapter 1707, R.C. 1707.03(M)(2) includes a specific definition of "beneficial owner" for the limited purpose of determining the number of beneficial owners under that statutory section. As a general rule of statutory interpretation, where the legislature manifests no intent that a general provision of the Revised Code take precedence over a special provision, the special provision controls. See R.C. 1.51; *Volpe, supra; Cincinnati v. Thomas Soft Ice Cream* (1977), 52 Ohio St.2d 76, 6 O.O.3d 277, 369 N.E.2d 778. The special definition of

"beneficial owner" in R.C. 1707.03(M)(2) relies on record ownership, in the absence of persuasive evidence to the contrary, to determine the beneficial owners of a class of securities; the determination of record ownership, in turn, is a factual matter for the trial court to determine. Here, the court found Premier's share journal to be the best evidence of record ownership and rejected defendants' attempt to expand ownership to include trusts or spouses of record owners.

Based on our review of the record, we cannot say the trial court erred in its determination. Defendants' third assignment of error is overruled.

■ In their fourth and fifth assignments of error, defendants assert that the trial court improperly placed the burden of proof on defendants regarding certain elements of the offense charged, which in turn resulted in ODS's failing to sustain its burden of proof on those elements and the trial court's granting injunctive relief against the manifest weight of the evidence.

■ ODS alleged that defendants violated R.C. 1707.44(C)(1), the essential elements of which are: (1) an unregistered security, (2) intentionally sold by defendants, and (3) which defendants knew, or in the exercise of reasonable diligence should have known, to be unregistered. See *State v. Trivedi* (1982), 8 Ohio App.3d 412, 8 OBR 534, 457 N.E.2d 868. The absence of an applicable exemption is not an element of the offense; rather, entitlement to such an exemption is an affirmative defense which must be raised by the defendant. *State v. Frost* (1979), 57 Ohio St.2d 121, 11 O.O.3d 294, 387 N.E.2d 235; see, also, *United States ex rel. Shott v. Tehan* (C.A.6, 1966), 365 F.2d 191. Further, R.C. 1707.45 provides that the burden of proof shall be upon the party claiming the benefits of sections such as R.C. 1707.03(M). See *Frost, supra.* As a result, defendants had the burden of proving that the transactions in question were exempt pursuant to R.C. 1707.03(M), which included the burden of proving the inapplicability of the exceptions to the exemption, set forth in R.C. 1707.03(M)(1) and (2). As previously discussed, the record supports the trial court's determination that defendants failed to prove that the exception of R.C. 1707.03(M)(2) did not apply to the stock sales in question.

■ Defendants also assert that the state failed to introduce any evidence showing that defendants sold securities "knowing" that they were unregistered in violation of R.C. 1707.44(C)(1).

The knowledge requirement of R.C. 1707.44(C)(1) must be read in conjunction with R.C. 1707.29, which provides that "the accused shall be deemed to have had knowledge of any matter of fact, where in the exercise of reasonable diligence, he should, prior to the alleged commission of the offense in question, have secured such knowledge."

The effect of R.C. 1707.29 is to define the term "knowingly" in R.C. 1707.44(C)(1) "more in terms of 'negligently' than knowingly," *State v. Walsh* (1979), 66 Ohio App.2d 85, 95, 20 O.O.3d 178, 184, 420 N.E.2d 1013, 1020, in essence imposing a reasonable duty of inquiry upon those who engage in the sale of securities. *Trivedi, supra.* Thus, a person violates R.C. 1707.44(C)(1) if the person sells unregistered securities which the person knows, or through the exercise of reasonable diligence should know, are unregistered. *Trivedi, supra,* 8 Ohio App.3d at 414, 8 OBR at 536–537, 457 N.E.2d at 871; see, also, *Walsh, supra.* Further, even after the state has presented evidence of knowledge, it may be rebutted by evidence that a defendant in fact exercised reasonable diligence in attempting to ascertain the nature of the securities to be sold. *Trivedi, supra; Walsh, supra,* 66 Ohio App.2d at 94, 20 O.O.3d at 184, 420 N.E.2d at 1019.

Although the record in this case does not contain any evidence from which one could reasonably conclude that defendants had actual knowledge that the stock they were selling was unregistered in violation of R.C. 1707.44(C)(1), the record reveals that both defendants were licensed by ODS to sell securities in Ohio, and that Wayne Meadows, who controlled M.C. Capital, had more than ten years of experience in the securities business. Based upon defendants' licensing and experience, reasonable minds could conclude that defendants in the exercise of reasonable diligence should have known that the stock they were selling was unregistered.

Nonetheless, defendants maintain that they satisfied the reasonable diligence requirement of R.C. 1707.44(C)(1) when they obtained a "due diligence package" from Premier prior to commencing stock sales. The "due diligence package," however, dealt only with the financial position of Premier and the registration of Premier's initial unit offering in December 1992 and January 1993; it had nothing to do with the necessity of registering the stock which defendants ultimately sold.

Given the foregoing, "some competent, credible evidence" exists supporting all essential elements of ODS's case. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. Thus, the judgment of the trial court is not against the manifest weight of the evidence. *Id.*

Defendants' fourth and fifth assignments of error are overruled.

In their sixth assignment of error, defendants allege that the trial court erred in entering judgment against defendant Wayne Meadows, individually.

Defendants argue that ODS failed to prove that Meadows violated R.C. 1707.44(C)(1), as it introduced no evidence to show that Meadows personally participated in any activity with the customers of M.C. Capital. An individual is guilty of violating R.C. 1707.44(C)(1) if that individual "knowingly and intentional-

ly sell[s], *cause[s] to be sold,* offer[s] for sale, or *cause[s] to be offered for sale* " any security described therein. (Emphasis added.) Although no evidence was introduced at trial to show that Meadows directly engaged in the sale of Premier stock, Meadows himself testified that he was the sole shareholder, sole director and sole officer of M.C. Capital and that he made all critical decisions with respect to the sales in question. Given that testimony, the trial court could properly find that Meadows individually "caused" Premier stock to be "offered for sale" and "sold" in violation of R.C. 1707.44(C)(1). Defendants' sixth assignment of error is overruled.

In its cross-appeal, ODS asks this court to review the trial court's statement that the stock defendants sold did not lose its exemption from registration under R.C. 1707.03(M)(1).

As noted, the trial court held that the stock defendants sold was not exempt from registration under R.C. 1707.03(M) because the stock was not "issued and outstanding" at the time that it was sold. The trial court further held that the stock would not have qualified for the R.C. 1707.03(M) exemption, even if it had been "issued and outstanding" when sold, because the sales were excepted from exemption under R.C. 1707.03(M)(2), given that fewer than twenty-five beneficial owners of the class of security being sold existed at the time of the sales. After reaching these holdings, the trial court finally determined that, "[f]or the information of the parties * * * [this] court does not find that any exemption would be lost because of R.C. 1707.03(M)(1)."

The trial court's final "determination" was entirely unnecessary to deciding the present case. Indeed, addressing the applicability of the R.C. 1707.03(M)(1) exception to the exemption would require us to consider a factual scenario not present in this case, as the trial court's proffered determination was premised on facts not in the record, including an assumption that defendants had exercised the warrants and acquired the stock prior to selling it. For the foregoing reasons, we decline to address the issues raised by ODS in its cross-appeal. Accordingly, the assignment of error raised by ODS on cross-appeal is overruled without any determination as to the issues raised therein.

Having overruled each of defendants' six assignments of errors, and having overruled cross-appellants' single assignment of error, we affirm the decision of the trial court.

*Judgment affirmed.*

DESHLER and CLOSE, JJ., concur.