I. INTRODUCTION
This case concerns an alleged scheme to defraud the investing public by Dublin Securities, Inc. ("DSI"), a now defunct intrastate penny stock dealer; DSI's affiliate, Dublin Management, Inc. ("DMI"), also defunct; Clarence J. (a.k.a. "C.J." or "Red") Eyerman, deceased, the CEO and owner of DSI and controlling shareholder of DMI; Dwight I. Hurd, the principal attorney for DSI, DMI and Red Eyerman; David M. Carmichael, former Executive Vice President and Chief Financial Officer of DSI; Robert D. Hodge, DSI's Vice President and General Sales Manager; and Beth Eyerman, President of DSI and Red Eyerman's daughter. The alleged scheme took place from January 1987 until October 22, 1992, when various authorities executed a search warrant upon the premises of DSI and DMI.
On April 14, 1994, a special grand jury returned a three hundred twenty-seven count indictment against the corporate and individual defendants identified above. The indictment alleged a scheme to defraud investors through the intrastate sale of millions of shares of low-priced, highly speculative stocks, generally selling at less than $5 a share ("penny stocks"). The indictment alleged that the scheme was carried out by means of deceiving the Ohio Division of Securities ("division") regarding the structure and management of securities offerings and by deceiving the public into buying penny stocks that DSI did not own, did not have the capital to acquire, and had no intention or reasonable expectation of delivering to the purchasers.
Each of the defendants was charged with one count of conspiracy to engage in a pattern of corrupt activity in violation of R.C. 2923.01 and one count of engaging in a pattern of corrupt activity ("RICO") in violation of R.C.2923.32. Hodge was charged with one count of aggravated theft, and he and Beth Eyerman were charged with numerous counts of theft and grand theft, all in violation of R.C. 2913.02(A)(3). Beth Eyerman was also charged with the sale of unregistered securities in violation of R.C. 1707.44(C)(1). Finally, Hurd and Beth Eyerman were charged with making false representations for the purpose of registering securities in violation of R.C.1707.44(B)(1).
The cases against the corporate defendants were severed. Red Eyerman and Carmichael entered guilty pleas, and the remaining defendants, Hurd, Hodge and Beth Eyerman (jointly "appellants") went to trial. Nearly every aspect of the trial was highly contentious, generating a voluminous record. The trial transcript alone consists of seventy-eight volumes, plus three volumes of closing arguments. The trial lasted approximately five months, beginning on July 10, 1995, and ending on December 11, 1995, when the jury returned verdicts against the appellants.
All appellants were convicted of violating the RICO statute. Hodge was acquitted of conspiracy, and the jury did not return verdicts on conspiracy with respect to Hurd and Beth Eyerman. In addition, Hurd was convicted of three counts of making false representations for the purpose of registering securities. Hodge was convicted of one hundred eighty-three theft offenses. Beth Eyerman was convicted of thirty-eight theft offenses, one count of making false representations for purposes of registering securities, and five counts of selling unregistered securities.
On appeal, Hurd assigns eighteen assignments of error, Hodge assigns six assignments of error, and Beth Eyerman assigns thirteen assignments of error. (See appendix.) After providing a factual background, we shall first address the assignments of error related to the securities violations, second address the assignments of error related to the theft offenses, and third address the assignments of error related to the RICO violations.
II. FACTUAL BACKGROUND
During the time period of the alleged conspiracy, DSI, a licensed securities dealer, was engaged in the sale of the stock of thirteen young companies in need of raising capital. In preparing materials required to be filed with the division, DSI relied upon the advice of Hurd and, for the most part, required the companies to use Hurd and his law firm to prepare the offering circulars and other materials required to be filed with the division.
The Ohio Securities Act prohibits the sale of securities unless certain statutory requirements are met. See,e.g., R.C. 1707.44(C)(1). In order to comply with these requirements, Hurd registered the offerings under R.C.1707.06(A)(1), a form of registration known as registration by description. Offerings registered under this statute generally received less stringent review by the division because total commissions are limited to three percent of aggregate proceeds and securities dealers were not normally interested or involved in such offerings.
Each of the deals involving the thirteen companies was structured similarly to allow for registration by description. The company, known as the "issuer," would sell approximately $500,000 worth of "units" to a group of initial unit purchasers selected by Red Eyerman. DSI provided the list of purchasers and a "script" to the issuer and instructed the issuer whom to call and how many units each could purchase. Each unit usually sold for $1 and consisted of one share of stock and a number of warrants. Each warrant entitled the owner to an additional share of stock upon surrender of the warrant along with the warrant exercise price, usually $1. The initial unit purchasers varied somewhat from offering to offering, but always included employees of DSI, salespeople, friends and family of Red Eyerman, and sometimes employees and friends of the issuer. Hurd's wife, Jackie Cooper, participated as an initial unit purchaser in several offerings, although Hurd himself did not. Hodge and Beth Eyerman were also initial unit purchasers in several offerings.
Red Eyerman had the right to approve or disapprove of the participation of any initial unit purchaser. Moreover, some initial unit purchasers were provided interest-free loans from DSI or DMI to purchase the units. The initial unit purchasers would then sell their warrants and shares to DSI at a price set by DSI, typically $.05 to $.10 for seventy percent of the warrants and $1 for the remaining warrants and shares. As such, initial unit purchasers made a significant financial return with little or no personal risk. This arrangement came to be known as the "Gentlemen's Agreement." If an initial unit purchaser did not sell his or her warrants to DSI, he or she risked being fired (if an employee) or never being permitted to participate in another offering. While DSI was operating, not one of the initial unit purchasers ever sold his or her warrants to anyone other than DSI.
In theory, DSI would then raise at least $1 million for the issuer by selling shares to the public (usually for $3 to $5 per share) and then exercising warrants to acquire such shares at $1 each from the issuers. In reality, DSI often sold shares to the public but failed or delayed exercising warrants to purchase shares for delivery to the investing public. If DSI had purchased a warrant from an initial unit purchaser for $.05 and exercised the warrant for $1, DSI would make $1.95 for each share sold at $3. If DSI did not exercise warrants but continued to sell to the public, the issuers received far less money than promised and investors did not receive their shares from DSI. The theft counts were all related to specific investors who had purchased but did not receive all shares that they had purchased from DSI.
The securities counts charging Hurd and Beth Eyerman with making material false statements were based upon the premise that Hurd and Beth Eyerman affirmatively misled the division as to the nature of the true plan of distribution of the securities. Specifically, the state claimed that registration materials filed with the division indicated that only the issuer would sell to the initial unit purchasers when, in fact, DSI controlled, through the Gentlemen's Agreement, the sales to the initial unit purchasers. Second, the state claimed that Hurd misled the division by causing documents to be issued that indicated only that DSI might create an "aftermarket" in the issuer's shares, when DSI's true plan was always to create an "aftermarket" and sell shares to the general public. Finally, the state contends that Hurd and Beth Eyerman falsely set forth in registration materials that commissions paid in connection with the offerings would not exceed three percent when, in fact, the initial sale of the units, the Gentlemen's Agreement, and the sale to the public, was a single plan to raise several million dollars from which DSI reaped profits (i.e.,
commissions) well in excess of three percent.
Beth Eyerman also was charged with the sale of unregistered securities since the securities sold by DSI to the public were not registered nor the subject of a registered transaction. At trial, Beth Eyerman relied on an exemption to the requirement that the shares sold to the public be registered. This exemption, contained in R.C. 1707.03(M) and referred to as the "3(M) exemption," generally exempts sales of securities already "issued and outstanding." The state claimed that this exemption was unavailable because DSI was selling shares to the public before DSI had exercised warrants to purchase the shares,i.e., "selling short." According to the state, selling shares short was not the sale of securities "issued and outstanding." In addition, the state claimed the exemption was unavailable because the Gentlemen's Agreement and the single plan of distribution cast DSI in the role of an "underwriter." Underwriters are prohibited from using the 3(M) exemption. See R.C. 1707.03(M)(1).
The defense presented evidence that the division was aware of the structure of the offerings, the identity of the initial unit purchasers, the fact that DSI was purchasing warrants for $.05 to $.10, and that DSI was regularly making an aftermarket selling stock to the public from each new offering. The defense also presented evidence that the division was well-aware of the exemption relied upon and DSI's practice of selling short. In spite of this knowledge, the division still continued to approve new offerings and relicensed DSI year after year.
With respect to the theft charges, the state proceeded on a theory of theft by deception. Many investors testified as to false and misleading statements DSI's salespeople told them in connection with the purchase of stock. For example, victims testified that DSI brokers gave them false assurances of the investments' safety and return by indicating that investment in penny stocks was safer than keeping their money in a bank and that the stock was expected to double or triple in price by the end of the year. Investors also were told that DSI's income from the sale of shares was only $.50 to $.75 per share, and the rest of the share price went into the company whose stock they were purchasing. In reality, much more than $.75 per share was going to DSI, particularly when DSI failed to exercise warrants for the stock they had sold.
Investors were never told that the money given to DSI to purchase shares was not being used to actually acquire shares in the issuing companies. Rather, money from new issues was used to pay off some earlier investors and, in turn, more offerings were required to pay off the more recent investors. This, the state alleged, was a classic "Ponzi scheme."[1] In addition, Red Eyerman was siphoning large amounts of cash from the business to pay gambling debts and other personal expenses. By 1991, DSI had loaned DMI over $3,000,000, and DMI in turn had loaned over $2,750,000 to Red Eyerman in the form of unsecured loans. Thus, DSI found itself in the position of not having enough cash to purchase shares it had already sold to investors. When investors asked why they had not received their shares, they were not told that DSI did not have the cash to acquire them. Instead, they were informed that delays in delivering their shares were due to time needed for paperwork processing or that the shares were being held in "street name."
Beth Eyerman joined DSI as president in June 1992, at the behest of her father, Red Eyerman, who had been hospitalized and was ill. Despite his poor health, Red Eyerman continued to exert tremendous control over the company, but he wanted his daughter there to act as his "eyes and ears." By the time of her arrival, DSI had a severe cash shortage problem.
According to Anthony Kohl, Carmichael's successor and DSI's Treasurer/Controller, he, Beth Eyerman and Hodge, devised a business plan to reduce the flow of money going to Red Eyerman and to the issuers, and to pay the company's obligations. According to the plan, as of June 10, 1992, DSI had $1,200,000 in cash and expected to receive $2,588,000 during the next weeks from the sale of Lifeline Shelter shares. The plan projected receiving about $6,000,000 over the next three months through the sale of new shares; however, at the same time, DSI owed $6,521,000 in current expenses, including $1,300,000 to investors who had sold their shares back to DSI, and $4,281,000 to exercise warrants to obtain and deliver shares already sold to investors. DSI also owed approximately $1,200,000 in back taxes.
The plan allocated $500,000 to investors who had sold back shares, but allocated no money to exercise any warrants in the next three months. Based on the plan and a meeting held with Red Eyerman that day, Kohl testified that he, Beth Eyerman and Hodge expected to sell two or three new packages by the end of the year and be able to have a "clean start for 1993."
The plan failed. Red Eyerman continued to spend, and unbeknownst to Beth Eyerman and Hodge, Kohl was embezzling from the company. DSI was able to begin selling only one new package, shares of Reitz Data, before the authorities executed the search warrant, effectively shutting down DSI. On October 21, 1992, the day before the search warrant was executed, DSI's daily stock position report showed that DSI had sold, but not delivered, over 5,000,000 shares of various issuers to thousands of investors. DSI had sold these shares for at least $3 per share and could have exercised warrants to purchase the shares for $1; however, on October 21, 1992, DSI had less than $600,000 in available cash. The only way DSI could get money to purchase those shares already sold was to get investors to purchase more shares in new issues.
With respect to the alleged RICO violations, the state's theory was that the entire operation of DSI was a scheme to steal from the public and divert huge sums of cash to Red Eyerman, his family and friends. The scheme was allegedly carried out by means of the various lies told to the division, the issuers and the investors. The charges of theft, making false representations in regard to registering securities, and selling unregistered securities were the predicate offenses alleged in the RICO count. Mail and wire fraud, in violation of Sections 1341 and 1433, Title 18, U.S. Code, although not separately charged in the indictment, were alleged as additional predicate acts.
The state claimed Hurd, although not technically an officer or employee of DSI, was involved in nearly every aspect of DSI's business, from taking part in the initial sales pitches to the issuers to getting new offerings out quickly when DSI did not have the cash to pay off investors. The state presented evidence that, in order to conceal the Gentlemen's Agreement, DSI's short position and DSI's unsecured loans, Hurd deceived many people including his own law partners, the division, the issuers and the investors. The state introduced Hurd's billing records as evidence of his use of the mails and interstate telephone calls in furtherance of this alleged scheme.
III. CHALLENGES TO SECURITIES COUNTS A. False Representation Charges.
Hurd and Beth Eyerman, in their first and fourth assignments of error, respectively, challenge their convictions for violating R.C. 1707.44(B), which generally prohibits certain false statements in regard to registering securities, selling securities and obtaining a securities dealer license. Hurd and Beth Eyerman contend that the evidence adduced at trial was insufficient as a matter of law to constitute a violation of R.C. 1707.44(B)(1) and that they were both convicted under an improper interpretation of that statute.
 At the time of indictment, R.C. 1707.44(B) provided that:
 No person shall knowingly make or cause to be made any false representation concerning a material and relevant fact, in any oral statement or in any prospectus, circular, description, application, or written statement, for any of the following purposes:
 (1) Complying with sections 1707.01 to 1707.45 of the Revised Code, in regard to registering securities by description;
 (2) Securing the qualification of any securities under such sections;
 (3) Procuring the licensing of any dealer or salesman under such sections;
(4) Selling any securities in this state.
Both Hurd and Beth Eyerman were charged with violating R.C.1707.44(B)(1), which by its terms, prohibits the making of material false statements in regard to registeringsecurities by description.[2] Hurd was convicted of three such counts, Counts 194, 195 and 196, and Beth Eyerman was convicted of one such count, Count 199. Appellants point out, however, that the state failed to produce any evidence that either Hurd or Beth Eyerman registered any security by description. Rather, Hurd and Beth Eyerman contend that the jury was instructed, and they were convicted, under an improper interpretation of the statute, i.e., that it also prohibits false statements in the registration of transactions by description.
As pointed out by appellants, Ohio securities law designates four types of registration methods, each governed by separate statutory and regulatory requirements. These four types are: (1) the registration of securities by description as provided for under R.C. 1707.05 and 1707.08; (2) the registration oftransactions by description as provided for under R.C. 1707.06
and 1707.08; (3) the registration of securities byqualification as provided for under R.C. 1707.09 and 1707.10; and (4) the registration of securities by coordination as provided for under R.C. 1707.091. The evidence in this case reveals that appellants filed form 6(A)(1) for each transaction at issue. Form 6(A)(1) is the form utilized to register atransaction by description pursuant to R.C. 1707.06(A)(1). See Ohio Adm. Code 1301:6-3-06. The state presented no evidence, however, that Hurd or Beth Eyerman registered any security by description as governed by R.C. 1707.05. Accordingly, since the state failed to present evidence of any registration of asecurity by description, the evidence was insufficient, argue Hurd and Beth Eyerman, to support a violation of R.C.1707.44(B)(1).
In response, the state concedes that neither Hurd nor Beth Eyerman ever registered any security by description. Rather, the state contends that R.C. 1707.44(B)(1) also prohibits false representations in the registering of transactions by description. The state argues that such a construction is not inconsistent with the language of the statute and, more importantly, is warranted by the rules of statutory construction as found in R.C. 1.49. In particular, the state argues that the legislature clearly intended R.C. 1707.44(B) to prohibit all material misrepresentations for purposes of complying with any of the registration requirements and that the legislative history of the statute reveals such an intent. Finally, the state argues that appellants' interpretation creates the absurd result of having a regulatory scheme that prohibits false representations with respect to a registration method seldom used (i.e., registering securities by description) but does not prohibit false representations with respect to a registration method frequently used (i.e.,
registering transactions by description).
As in any case of statutory construction, the paramount goal is to ascertain and give effect to the legislature's intent in enacting the statute. Brooks v. Ohio State Univ. (1996),111 Ohio App.3d 342, 349 (citing Featzka v. Millcraft Paper [1980],62 Ohio St.2d 245). In so doing, however, the court must first look to the plain language of the statute itself to determine the legislative intent. State ex rel. Burrows v. Indus. Comm.
(1997), 78 Ohio St.3d 78, 81; In re Collier (1993), 85 Ohio App.3d 232,237 ("Under Ohio law, it is a cardinal rule that a court must first look to the language of the statute itself to determine the legislative intent."). Thus, if the language used in a statute is clear and unambiguous, the statute must be applied as written and no further interpretation is necessary.Burrows. "It is only where the words of a statute are ambiguous, uncertain in meaning, or conflicting that a court has the right to interpret a statute." Brooks, at 349.
Ambiguity in a statute exists only if its language is susceptible to more than one reasonable interpretation. See,e.g., State ex rel. Toledo Edison Co. v. Clyde (1996), 76 Ohio St.3d 508,513. Thus, inquiry into the legislative intent, legislative history, public policy, the consequences of an interpretation, or any of the other factors identified in R.C.1.49 is inappropriate absent an initial finding that the language of the statute is, itself, capable of more than one meaning. See, e.g., Toledo; see, also, Fairborn v. DeDomenico
(1996), 114 Ohio App.3d 590, 593 ("R.C. 1.49 does not, however, authorize judicial inquiry into legislative intent where the statute is unambiguous."). The court's understanding of legislative intent alone cannot make an otherwise clear statute ambiguous.
Here, we find that the language of R.C. 1707.44(B)(1) is not reasonably susceptible to the interpretation advanced by the state. In so finding, we reject the state's argument that the statute's prefatory reference to "[c]omplying with sections1707.01 to 1707.45 of the Revised Code" effectively incorporates all provisions dealing with registrations by description and not just those related to the registration of securities by description. The state's interpretation ignores the statute's remaining phrase, which qualifies or limits which code provisions are implicated, i.e., those "in regard to registering securities by description." Thus, when the statute is read in its entirety, the prefatory language is properly viewed as incorporating all material code provisions that may be implicated when a security is registered by description. Simply put, appellants' interpretation is consistent with both phrases of the statute, but the state's interpretation is consistent with only one phrase of the statute. Thus, the state's interpretation violates one of the key tenets of statutory construction — i.e., that every word in a statute is presumed to have some legal effect. State v. Moore (1994),99 Ohio App.3d 748, 751; see, also, In re Collier, at 237 ("Courts do not have the authority to ignore the plain and unambiguous language of a statute under the guise of statutory interpretation, but must give effect to the words used.").
We find nothing in the language of R.C. 1707.44(B)(1) to be ambiguous. By its plain terms, it prohibits false statements in regard to the registering of securities by description, but does not prohibit false statements in regards to the registering of transactions by description. While we recognize that this interpretation of R.C. 1707.44(B)(1) results in the exclusion of certain types of registrations from the code's prohibition against making material false statements, we find that such a result cannot be avoided given the unambiguous language of the statute. See Canton v. Imperial Bowling Lanes
(1968), 16 Ohio St.2d 47, paragraph four of syllabus (it is the duty of the courts to construe a statute to avoid unreasonable or absurd consequences unless restrained by the clear languagethereof). Thus, while the state's arguments as to the legislative intent and the consequences of appellants' interpretation are persuasive as to what the statute should
say, the arguments are insufficient to overcome what the statute clearly does say. The remedy is to be found in the legislature, not a tortured judicial interpretation of a statute unambiguous on its face.
We, therefore, find that Hurd's first assignment of error and Beth Eyerman's fourth assignment of error are both well-taken. There was no evidence that either violated R.C. 1707.44(B)(1), and both were convicted on an improper interpretation of that statute.
 B. Beth Eyerman's Challenges to Her Convictions for Selling Unregistered Securities.
In her second assignment of error, Beth Eyerman challenges her convictions for selling unregistered securities in violation of R.C. 1707.44(C)(1) on the basis that such convictions violated her rights as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. First, Beth Eyerman contends that R.C.1707.44(C)(1) is unconstitutionally vague on its face. Second, Beth Eyerman contends that the trial court retroactively applied this court's 1994 decision of Chiles v. M.C. CapitalCorp. (1994), 95 Ohio App.3d 485, to preclude her use of the 3(M) exemption to the shares sold by DSI.
1. Vagueness Challenge.
Beth Eyerman first argues that R.C. 1707.44(C)(1) is void for vagueness. R.C. 1707.44(C)(1) provides as follows:
 No person shall knowingly and intentionally sell, cause to be sold, offer for sale, or cause to be offered for sale, any security which comes under any of the following descriptions:
 (1) Is not exempt under section 1707.02 of the Revised Code, nor the subject matter of one of the transactions exempted in sections 1707.03, 1707.04, and 1707.34 of the Revised Code, has not been registered by description, coordination, or qualification, and is not the subject matter of a transaction that has been registered by description[.] [Emphasis added.]
The state charged Beth Eyerman with violating R.C.1707.44(C)(1) on the theory that only the sale of the initial units, which consisted primarily of warrants, was registered with the division but that the shares subsequently sold by DSI to the investing public were neither registered nor the subject of a registered transaction. At trial, Beth Eyerman did not dispute that the shares sold by DSI to the investing public were not registered but maintained that the securities were otherwise exempt from registration.
In order to establish that a statute is void for vagueness, a defendant must show that the statute fails to give persons of ordinary intelligence fair notice that their conduct is prohibited. State v. Dorso (1983), 4 Ohio St.3d 60, 61; UnitedStates v. Harriss (1954), 347 U.S. 612, 617, 74 S.Ct. 808, 811. Beth Eyerman argues that the use of the conjunction "and" rather than "or" in the last clause of R.C. 1707.44(C)(1) renders the provision so nonsensical as to be void for vagueness. According to Beth Eyerman, when read literally, R.C.1707.44(C)(1) permits a security to be sold only where the security is exempt from registration or part of a transaction which is exempt from registration, and registered by description, coordination, or qualification, and the subject matter of a transaction that has been registered by description.
Beth Eyerman is correct in that R.C. 1707.44(C)(1) makes no sense if read in the conjunctive. Such a reading renders the registration exemptions contained elsewhere in R.C. Chapter 1707 meaningless and would mandate superfluous registration; however, despite the use of the word "and" in R.C.1707.44(C)(1), the provision need not be read in the conjunctive. The "General definitions" section of the Ohio Revised Code expressly provides that the word "and" may be read as "or" "if the sense [of the statute] requires it." R.C.1.02(F). When "or" is substituted for "and" in the last clause of R.C. 1707.44(C)(1), a person of common intelligence is easily able to discern that the statute prohibits the sale of any security which is not one of the following: (1) exempt or part of an exempt transaction; or (2) registered by description, coordination or qualification; or (3) the subject matter of a transaction that has been registered by description.
In so noting, we reject Beth Eyerman's contention that her interpretation of R.C. 1707.44(C)(1) is mandated by the rule of lenity as found in R.C. 2901.04(A), which states that criminal statutes "shall be strictly construed against the state, and liberally construed in favor of the accused." First, Beth Eyerman's interpretation actually renders the statute more onerous not less onerous. Under her interpretation, a security must satisfy more, not fewer, requirements before it can be sold legally. Moreover, the rule of lenity only applies where there otherwise is ambiguity in the meaning of a statute.State v. Arnold (1991), 61 Ohio St.3d 175, 178. Thus, the rule's applicability to a general definitional provision of the Ohio Revised Code is limited. See State v. Kenmore Co. (1972),34 Ohio App.2d 19 (rule of lenity does not preclude reading "and" as "or" in criminal statute).
Thus, because R.C. 1707.44(C)(1) can be easily understood using the general definition section, the provision is not unconstitutionally vague. The portion of Beth Eyerman's second assignment of error alleging a vagueness challenge to R.C.1707.44(C)(1) is overruled.
2. Retroactive application of Chiles v. M. C. Capital to the3(M) Exemption.
In her second assignment of error, Beth Eyerman also contends that the trial court erred in violation of her Due Process Rights by retroactively applying this court's decision ofM.C. Capital, which held that shares sold against unexercised warrants, like those sold by DSI here, did not fall within the exemption provided under R.C. 1707.03(M). In particular, Beth Eyerman argues that the M.C. Capital decision so altered the scope of the 3(M) exemption that application of the decision to sales of securities that occurred prior to the announcement of the decision violated her right to fair notice embodied in due process.
R.C. 1707.03(M), which all parties concede was the only possible exemption applicable to the shares sold by DSI, generally exempts the secondary sale of shares already "issued and outstanding." It provides as follows:
 A sale by a licensed dealer, acting either as principal or as agent, of securities issued and outstanding before the sale is exempt, unless the sale is of one or more of the following [exceptions]. [Emphasis added.]
During the jury charging conference, the trial court agreed to use a definition of "securities issued and outstanding" consistent with the language set forth in M.C. Capital — a definition that specifically excluded any shares sold before they were obtained through the exercise of warrants. Beth Eyerman contends that by defining "issued and outstanding" to exclude such shares, the trial court applied a definition that did not exist prior to M.C. Capital, that was contrary to the prior position of the division, and more importantly, that conflicted with the division's previous regulatory dealings with DSI. In sum, Beth Eyerman contends that M.C. Capital
unforeseeably and unexpectedly changed the understanding of "issued and outstanding" from that understood at the time the securities were sold by DSI, and that to criminally prosecute her under the later definition violates basic notions of fair notice embodied in due process.
Fundamental to the concept of due process, is the notion that a person has a right to fair warning of what conduct will give rise to criminal penalties. See Harriss, at 617, S.Ct., at 812 ("[N]o man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."). Thus, an unforeseeable judicial enlargement of a criminal statute may not be retroactively applied to conduct occurring before that judicial decision, as such application offends the notion of fair warning embodied in the Fourteenth Amendment's Due Process Clause. See Bouie v. City of Columbia (1964),378 U.S. 347, 350-351, 84 S.Ct. 1697, 1701; Marks v. United States
(1977), 430 U.S. 188, 191-192, 97 S.Ct. 990, 992-993; Rabe v.Washington (1972), 405 U.S. 313, 315, 92 S.Ct. 993; see Statev. Saylor (1966), 6 Ohio St.2d 139, 141.
As noted by the United States Supreme Court inBouie, 378 U.S. at 353-354, 84 S.Ct. at 1702-1703:
 * * * [A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art. I, § 10, of the Constitution forbids. An ex post facto
law has been defined by this Court as one "that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action," or "that aggravates a crime,
or makes it greater than it was, when committed." * * * If a state legislature is barred by the Ex Post Facto Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction. * * * The fundamental principle that "the required criminal law must have existed when the conduct in issue occurred," * * * must apply to bar retroactive criminal prohibitions emanating from courts as well as from legislatures. * * * [Emphasis (sic).]
In State v. George (1975), 50 Ohio App.2d 297, this court specifically prohibited the retroactive application of a judicial enlargement of the Ohio securities laws in a criminal context. Like Beth Eyerman here, the defendant in George had been found guilty of selling securities in violation of R.C.1707.44(C). At trial, the trial court applied a definition of "security" that had been first announced in an unreported decision of this court, Peltier v. Koscot Interplanetary, Inc.
(Nov. 14, 1972), Franklin App. No. 72AP-220, unreported (1972 Opinions 2988), rendered six days before the acts for which the defendant was convicted took place. On appeal, the defendant challenged the application of the Koscot decision to his charges as a retroactive enlargement of a criminal statute in violation of due process. This court agreed. In so doing, this court noted that, in Koscot, it had recognized a "modern test" of what constitutes a security, that this "modern test" was specifically adopted from another jurisdiction, and that this test was not otherwise contrary to the law as previously pronounced by the Ohio Supreme Court. This court recognized, however, that Koscot was "in effect a broadening of what the courts in this state had previously considered to fall within the term 'security' under the Ohio securities act." George, at 306. Thus, even though the defendant's conduct occurred six days after the rendering of the Koscot decision and that theKoscot decision did not conflict with the prior governing precedents, principles of due process dictated a finding that the defendant had not been given fair notice of the status of the law that he was bound to follow and that, as such, his conviction must be reversed.
We find that the same principles of due process are implicated here. In M.C. Capital, this court addressed the issue of what constitutes "issued and outstanding securities" under R.C. 1707.03(M), an issue not previously addressed by any other Ohio court. In M.C. Capital, the defendant, like DSI, was a penny stock dealer that had engaged in the practice of selling shares to the public before exercising warrants to obtain such shares. In March 1993, five months after the authorities raided DSI, the division filed a civil enforcement action against M.C. Capital alleging that it was selling unregistered securities in violation of R.C. 1707.44(C) and seeking an injunction against future sales. The trial court ruled that M.C. Capital could not take advantage of the 3(M) exemption because its short sales did not constitute sales of shares already issued and outstanding.
This court affirmed, holding that shares sold before warrants were exercised did not constitute sales of issued and outstanding shares. Noting that the terms "issued" and "outstanding" were not defined in the Ohio Revised Code or by Ohio case law, this court looked to other sources for "guidance" as to their meaning. M.C. Capital. Citing 11 Fletcher, Encyclopedia of the Law of Private Corporations (Perm.Ed. 1986) 22, Section 5082; Black's Law Dictionary (6 Ed.Rev. 1990) 1416, 1417; and case law from outside of Ohio, this court defined "issued and outstanding" as follows:
 Issued stock generally is that part of a corporation's authorized stock that has been distributed to the public, while outstanding stock is that portion of the issued stock which remains in the hands of the public. The critical distinction between the two is that treasury stock may be included in issued stock, but not in outstanding stock. * * * [M.C. Capital, at 491.]
In defining "issued and outstanding" to exclude shares sold before warrants were exercised, this court rejected defendant's argument that the 3(M) exemption only required that theclass of securities, rather than each security, be issued and outstanding. This court stated that such an interpretation was inconsistent with the statutory language, which only refers to "securities" and not "classes of securities" — a concept and distinction otherwise made in the securities code when intended. As such, this court held that the 3(M) exemption's requirement that shares be issued and outstanding did not include shares sold before they were obtained through the exercising of warrants.
On appeal here, the state argues that this court, in M.C.Capital, merely applied the separate definitions of the terms "issued securities" and "outstanding securities" found in two well-known and readily available legal sources. Consequently, the phrase "issued and outstanding securities" was readily ascertainable prior to its announcement of M.C. Capital and, as such, M.C. Capital did not work an unforeseen judicial change in the scope of the R.C. 1707.03(M) exemption. According to the state, M.C. Capital merely recognized judicially what always existed in the statutory text.
Rather than confining our analysis to the language of R.C.1707.03(M) as the state wishes, we find significant the evidence in the record that prior to M.C. Capital, the division maintained a contrary position. Prior to the litigation in M.C.Capital, the division (the agency authorized to apply and enforce Ohio's securities laws, see, e.g., R.C. 1707.13 and 1707.23) did not view or treat such short sales as being excluded from the terms "issued and outstanding" under R.C.1707.03(M).
First, we note that, prior to M.C. Capital, the division's only official pronouncement concerning the 3(M) exemption was contained in a November 1973 Ohio Securities Bulletin "Interpretive Opinion." In this opinion, the phrase "sales of 'issued and outstanding' securities" is not specifically defined, let alone described in accordance with the definition recognized in M.C. Capital — i.e., sales in only those particular shares already issued and still in the hands of a shareholder. Rather, the phrase is merely equated with the more general phrase "'secondary market' trading." The division's lack of a specific pre-M.C. Capital position regarding the meaning of "issued and outstanding securities" in the 3(M) exemption was also reflected by the trial testimony of Michael Miglets, an attorney employed with the division since 1982, who was the head of the division's registration section and who had served as the acting commissioner. On cross-examination, Miglets conceded that, prior to the M.C. Capital case, he had not even considered whether short sales were sales of "issued and outstanding" securities under the 3(M) exemption. Thus, it is clear from his testimony that the division had no affirmative understanding that sales of shares against unexercised warrants were excluded from the 3(M) exemption prior to the M.C. Capital litigation.
More compelling, however, is the evidence showing that the division specifically knew of DSI's practice of selling shares against unexercised warrants and that this fact did not preclude the availability of the 3(M) exemption. For example, in March 1988, as part of the division's annual field examination of DSI, Division Examiner Everett L. Toland prepared an Examination Report. In preparing his report, Toland examined DSI's records with respect to DSI's stock offering in Agent's Financial Group, Inc. ("AFGI"). Examiner Toland's report provides as follows:
 The Company [DSI] accountant is on vacation and will not return until May 23, 1988.
 Mr. Eyerman [Red] was very cooperative and provided this examiner with enough records to determine the following:
 (1) Securities (stock) was sold, then blocks of 100,000 warrants were submitted to "Agents Financial Group, Inc." for conversion to stock.
When converted, it [the stock] went to the transfer agent and when it was received by the Company, it was then issued to the customers who had purchased the stock.
 (2) Examiner viewed a three half (3 1/2) inch stack of stock certificates made out to customers that had been recently processed. A copy of one (1) of the certificates is attached.
(3) A copy of a warrant is attached.
 (4) A copy of a Customers Account Card is attached. The customer bought stock at $2.50 per share and sold it on May 18, 1988, at 2.8750 (2 7/8).
 (5) The company purchased the warrants as follows: 4 WTS. [warrants] @ .05¢ and the 5th at $1.00, for a total purchase price of $1.20.
 (6) The value of the warrants carried on the Company books was established by the C.P.A. firm of "Bolon, Hart Boehler, Inc." Cost $1.20, Conversion Cost $1.25 plus the difference in market value.
 (7) Mr. Eyerman said it takes from three (3) to six (6) months to process the warrants and issue the stock certificates to customers.
(8) The Ohio State Bank is the transfer agent.
 (9) The following make a market in, "Agents Financial Group, Inc.":
(1) Dublin Securities, Inc.
(2) Corna Co.
(3) Equitable Securities.
 (10) Examiner found no violations of securities Rules Regulations. Should copies of the records be desired, the accountant will provide them when he returns from vacation.
 (11) Attached: A copy of the extension agreement $1.25 per share if exercised before June 30, 1988.
Respectfully
 E.L. Toland /s/ [Emphasis added. Hurd's Exhibit 166.]
This report demonstrates that examiner Toland and, consequently, the division were aware that DSI was selling securities short against warrants. Miglets testified at trial that the report revealed that DSI used warrants to satisfy its after market sales of shares. As such, the report is entirely inconsistent with the state's theory that short sales precluded application of the 3(M) exemption and that such a rule was readily understood before M.C. Capital. As indicated above, it was only through application of the 3(M) exemption that any of the shares sold by DSI would be legal. Yet, the same report, which details the exact conduct that the state argues made the 3(M) exemption unavailable and, hence, the sales by DSI illegal, concludes that no violations of any securities rules and regulations were found. Moreover, having received this detailed report on DSI's practice of selling shares against unexercised warrants, no enforcement action was taken by the division.
Similarly, DSI filed annual audit reports with the division for the years 1987, 1990 and 1991, as required by Ohio Adm. Code1301:6-3-15(H). (State's Exhibit 17.) Under the heading "Liabilities," each of the audit reports contains an entry for "Securities Sold, But Not Yet Purchased" indicating the expenses DSI would incur in exercising the warrants necessary to deliver stock that it had sold, but not yet acquired, as of the end of the reporting period. These audit reports reveal that, beginning in 1988, DSI regularly and plainly disclosed to the division its practice of selling securities short against warrants. Again, despite this disclosure, the division continued to reissue DSI's annual Broker/Dealer license and took no action to stop the practice until initiating the criminal investigation that resulted in this case several years later.
Given this evidence, we find that M.C. Capital's definition of issued and outstanding was an unforeseeable change in the law as it related to DSI. In so finding, we emphasize that this court's decision in M.C. Capital was, and remains, consistent with the language of the statute and was wholly appropriate given the procedural posture of that case — a civil enforcement action seeking to prospectively enjoin future short sales. However, as in George, we find that Beth Eyerman did not have fair notice that DSI's practices of selling shares against unexercised warrants precluded application of the 3(M) exemption given the lack of prior guidance by Ohio case law, the division's own 1973 general description of "sales of issued and outstanding securities," and the historical relationship between the division and DSI. Under such facts, Beth Eyerman's conviction for selling unregistered securities offends the basic notions of fair notice embodied in due process. SeeMarks; see, also, cases holding that fundamental fairness embodied in the Due Process Clauses forbids convictions for conduct which was initiated or continued in good-faith reliance upon a responsible government official's misrepresentation as to the conduct's legality. See, e.g., Raley v. Ohio (1959),360 U.S. 423, 79 S.Ct. 1257 (due process required reversal of contempt conviction based upon defendant's exercising a privilege that the government official said was available); Coxv. Louisiana (1965), 379 U.S. 559, 569-571, 85 S.Ct. 476,483-484 (due process required reversal of conviction for violating statute that prohibited picketing near a state court when certain police officials otherwise gave defendants permission to picket near a courthouse); United States v.Pennsylvania Indus. Chem. Corp. (1973), 411 U.S. 655, 670-675,93 S.Ct. 1804, 1814-1817 (due process required defendants the opportunity to show good-faith reliance on an administrative interpretation of the Rivers and Harbors Act of 1899 even though applicable case law on the specific legal issue was clearly to the contrary).
We find that Beth Eyerman's second assignment of error as to the retroactive application of M.C. Capital is well-taken. In so holding, we do not grant Beth Eyerman an outright acquittal on the charges of selling unregistered securities because Beth Eyerman's entitlement to the 3(M) exemption is not otherwise established as a matter of law. The applicability of the 3(M) exemption is not dependent solely upon proof that the shares were issued and outstanding. Rather, R.C. 1707.03(M)(1), (2) and (3) provide three exceptions to the exemption. Here, the jury was instructed, without objection, as to one of these exceptions, the "underwriter exception" found in R.C.1707.03(M)(1), which generally excludes persons who act as underwriters from taking advantage of the 3(M) exemption. Thus, even if the shares sold here were issued and outstanding, a jury could reasonably find that given the true nature of the relationship between DSI, the issuers, and initial unit purchasers (i.e., the Gentlemen's Agreement), DSI was acting as an underwriter under the provisions of R.C. 1707.03(M)(1). The entire thrust of Miglets' testimony is that he eventually became suspicious of DSI's entitlement to the 3(M) exemption, not because of DSI's short positions, but because of the mounting evidence that DSI was really acting as an underwriter. As such, a reasonable jury could still find that the 3(M) exemption did not apply to the shares sold here.
Consequently, Beth Eyerman's second assignment of error is sustained to the extent that she is entitled to a new trial on the counts charging her with selling unregistered securities in violation of R.C. 1707.44(C)(1).
IV. CHALLENGES TO THEFT COUNTS A. Sufficiency Challenge.
In their fifth assignments of error, both Beth Eyerman and Hodge argue that the state failed to present sufficient evidence to support their theft convictions. Whether the evidence is legally sufficient to sustain a guilty verdict is a question of law. State v. Thompkins (1997), 78 Ohio St.3d 380,386. In reviewing Beth Eyerman's and Hodge's sufficiency claims we must determine whether the evidence presented at trial and viewed in a light most favorable to the state would allow a rational trier of fact to find the essential elements of theft by deception to be proven beyond a reasonable doubt with respect to each of the challenged counts. See State v.Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
R.C. 2913.02 sets forth the crime of theft by deception as follows:
 (A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
* * *
(3) By deception;
* * *
 (B) Whoever violates this section is guilty of theft. Except as otherwise provided in this Division, a violation of this section is petty theft, a misdemeanor of the first degree. If the value of the property or services stolen is five hundred dollars or more and is less than five thousand dollars * * *, a violation of this section is theft, a felony of the fifth degree. If the value of the property or services stolen is five thousand dollars or more and is less than one hundred thousand dollars * * *, a violation of this section is grand theft, a felony of the fourth degree. * * * If the value of the property or services stolen is one hundred thousand dollars or more, a violation of this section is aggravated theft, a felony of the third degree. * * *
In order to obtain a conviction for theft by deception under R.C. 2913.02(A)(3), the state must establish the following: (1) that the accused knowingly obtained or exerted control over property or services; (2) that the accused obtained or exerted such control with purpose to "deprive," and (3) that the accused obtained or exerted such control by knowing "deception." State v. Shaw (Aug. 8, 1995), Franklin App. No. 94APA12-1778, unreported (1995 Opinions 3358); State v. Habash
(Jan. 31, 1996), Summit App. No. 17073, unreported. The term "deprive" is defined in R.C. 2913.01(C) as follows:
(C) "Deprive" means to do any of the following:
 (1) Withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with the purpose to restore it only upon payment of a reward or other consideration;
 (2) Dispose of property so as to make it unlikely that the owner will recover it;
 (3) Accept, use, or appropriate money, property, or services, with purpose not to give proper consideration in return for the money, property or services, and without reasonable justification or excuse for not giving proper consideration.
The term "deception" is defined in R.C. 2913.01 (A) as follows:
 "Deception" means knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact.
The theory underlying the state's prosecution of Beth Eyerman and Hodge for theft by deception is that they were accomplices[3] in a scheme carried out by DSI, through its officers and employees, whereby DSI knowingly obtained control over the money of the investing public with the purpose to deprive them of their money, and did so by deceiving them into believing that they were investing their money in shares of penny stock. In particular, the state alleged that, when DSI found itself in financial trouble, Beth Eyerman and Hodge engaged in a Ponzi scheme in which some earlier investors were paid off by money put up by later investors.
In challenging their theft convictions, Beth Eyerman and Hodge argue that the state failed to prove that they intended to deprive the investors of their money. Specifically, Beth Eyerman and Hodge argue that, in order to prove them guilty of theft by deception, the state was required to show that when DSI accepted money from investors they did not intend to deliver the stock as promised in exchange. At trial, the state sought to prove such intent by demonstrating that Beth Eyerman and Hodge knew that it was impossible to deliver the stock they were selling due to DSI's insolvency. However, Beth Eyerman and Hodge argue that, while the state did present a great deal of evidence that they knew that DSI had serious cash flow problems, the state presented no evidence that either of them knew of DSI's insolvency at the time of the alleged thefts. At oral argument before this court, the state apparently abandoned the "insolvency theory," arguing in the alternative that Beth Eyerman and Hodge committed theft by deception, when due to lack of cash, they knew there was no reasonable expectation they would be able to deliver shares, yet they continued to accept money from investors and use their money to pay off investors from previous offerings.
In State v. Creager (Aug. 10, 1983), Tuscarawas App. No. 1665, unreported, the Fifth District Court of Appeals addressed a similar scenario. The defendant opened a coin shop, and various persons gave him large sums of money upon the defendant's representation that they were investing in his business. He promised the investors that he would pay upon the investments ten percent per month, fifteen percent per month and, in some cases, twenty percent per month. The defendant told the investors that he was using their money to buy gold, silver, coins, and collectibles. In reality, he used their money mainly to pay off earlier investors. Approximately a year later, the defendant declared bankruptcy, stating that he owed over $8 million.
While continually asserting that he did not intend to defraud or cheat anyone, the defendant admitted to the prosecutor that he knew he was in financial trouble and that he was "robbing Peter to pay Paul." There was also evidence that the defendant admitted that he knew in November that he could not pay the money back, yet he continued to accept new money from investors in December and January.
The court of appeals affirmed his convictions for theft by deception, reasoning that, even if the defendant had started out with the honest intention to achieve great wealth in a rising gold, silver, and coin market, when the market turned against him, he deceptively withheld the truth from his investors and exerted control over their money by deceiving them from trying to regain their funds.
Thus, under R.C. 2913.02, theft by deception is established if there is sufficient evidence to support a finding that Hodge and Beth Eyerman knowingly accepted payment from investors, without disclosing that there was no reasonable expectation they would be able to deliver the shares or that delivery would be delayed indefinitely, and that they did so for the purpose of obtaining the use of the investors' money without compensating the investors for that use in the form of interest or otherwise.
Here, the evidence viewed in the light most favorable to the state established these requirements. In particular, the crucial testimony regarding appellants' intent was provided by Tony Kohl, DSI's former Treasurer/Controller. Kohl testified that, at the meeting held at Red Eyerman's home on June 10, 1992, he, Beth Eyerman and Hodge presented a business plan which they had prepared for getting DSI back on a sound financial footing. The business plan developed by Kohl, Beth Eyerman and Hodge consisted of two essential elements: (1) reducing the amount of money flowing out of DSI by getting Red Eyerman to agree to stop promising issuers money which the company could not afford to pay, and to control the amount of money he took out of DSI for personal use; and (2) infusing cash into DSI through two or three new stock offerings during the second half of 1992.
Kohl also testified at length regarding state's Exhibit 647, a copy of a financial report which Kohl explained he had prepared as an aid in presenting the business plan at the June 10th meeting. The report sets forth DSI's cash reserve, receivables and expenses as of June 10, 1992. The report further projects the company's income and non-deferrable expenses for the months of July, August and September of that year. Kohl testified that the report indicates that, under the business plan, it was projected that DSI would receive $2,800,000 in July, $2,240,000 in August, and $960,000 in September from the ongoing sale of shares of Lifeline Shelters. The report further indicates that, as of June 10, 1992, DSI had yet to deliver more than 2,280,000 shares of stock sold in earlier offerings, and had yet to deliver any of the two million shares of Lifeline Shelters which it had sold since that offering opened on May 22, 1992. However, Kohl testified, and the report indicates, that despite having a projected income of $6 million during the first three full months of the business plan, the plan projected that DSI's non-deferrable expenses for that same period would exceed the company's income by almost $500,000. (State's Exhibit 900.) This was true even though the plan did not take into account the more than $1 million in back taxes that DSI owed by June 1992, and on which the company was incurring penalties and interest charges. Because DSI's non-deferrable expenses were projected to greatly exceed the company's income, the financial plan allocated no money to exercising warrants for the purpose of delivering the ever-growing number of undelivered shares of stock during July, August, or September. (State's Exhibit 900.)
Kohl further stated that although Red Eyerman agreed during the meeting at his home that he would reduce the amount of money he was causing DSI to expend, he failed to abide by that commitment almost immediately. According to Kohl, by the time he arrived back at DSI's offices following the meeting, he learned that Red Eyerman had already promised an issuer money that was not part of the plan. According to Kohl, when he informed Beth Eyerman and Hodge of Red Eyerman's failure to stick to the plan, they simply said that there was nothing they could do about it. Kohl also described an incident on July 1, 1992, in which Red Eyerman caused DSI to purchase 281,350 warrants in Aerospace Lubricants from him for more than $175,000. At the time, Aerospace Lubricants was one of the few issuing companies for which DSI had no need to acquire warrants, as DSI had already delivered all of the shares of stock it had sold in Aerospace Lubricant. Nevertheless, when Kohl informed Beth Eyerman that her father had taken more than $175,000 out of the company, she again said there was nothing she could do about it.
This evidence is sufficient to permit the jury to find that, after the meeting on June 10, 1992, Beth Eyerman and Hodge knowingly aided and abetted DSI in accepting payment from investors, without disclosing that it would be unable to deliver the stock which the investors were purchasing at anytime in the foreseeable future, and that appellants engaged in such conduct for the purpose of obtaining the use of the investors' money without compensating the investors for that use in the form of interest or otherwise. The jury could have found that the payments that DSI accepted for stock sold after June 10, 1992, amounted to loans for which Beth Eyerman and Hodge did not intend to compensate the investors.
Although the evidence is sufficient to convict Beth Eyerman and Hodge of the theft offenses related to sales of shares after the June 10, 1992 meeting, the evidence is insufficient as to sales before that date. As to Beth Eyerman, none of the theft counts for which she was convicted related to any sales before June 10, 1992. However, forty-eight counts (Counts 3, 6, 12, 13, 14, 15, 16, 35, 36, 37, 38, 39, 42, 44, 45, 46, 47, 49, 50, 51, 53, 54, 55, 58, 59, 60, 62, 65, 66, 69, 72, 73, 75, 76, 77, 78, 79, 81, 82, 85, 86, 88, 89, 90, 92, 93, 94, and 95) of which Hodge was convicted concern sales alleged to have occurred on or before June 10, 1992, and must, therefore, be reversed.
B. Manifest Weight Challenge.
Hodge also argues in his fifth assignment of error, that his theft convictions are against the manifest weight of the evidence. In reviewing a claim that a criminal conviction is against the manifest weight of the evidence, an appellate court, sitting as a "thirteenth juror," reviews the entire record, weighs the evidence and all inferences reasonably drawn therefrom, and considers the credibility of witnesses.Thompkins, at 387. The discretionary power to grant a new trial on manifest weight grounds should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction, and it appears that the jury lost its way and created such a manifest miscarriage of justice that a new trial must be ordered. Id.
Given our prior reversal of all of Hodge's theft convictions arising out of sales which occurred on or before June 10, 1992, on sufficiency grounds, our manifest weight review is limited to those theft convictions arising out of sales which occurred after June 10, 1992. Following a careful review and weighing of all the evidence presented in this case, we conclude that Kohl's testimony regarding the June 10th meeting is sufficiently credible to support Hodge's convictions for thefts alleged to have occurred after that date. Consequently, we cannot say that the convictions are against the manifest weight of the evidence.
Based upon the foregoing discussion, Beth Eyerman's fifth assignment of error is overruled with respect to her theft convictions; Hodge's fifth assignment of error is overruled in part and sustained in part with respect to his sufficiency challenge to his theft convictions and overruled with respect to the manifest weight challenge to his theft convictions.
C. Challenge to Jury Instructions.
In their eighth assignments of error, Beth Eyerman and Hodge contend the trial court erroneously instructed the jury with respect to the intent requirement necessary to find them guilty of aiding and abetting a theft offense. Specifically, Beth Eyerman and Hodge allege the jury instructions allowed each to be convicted as an accomplice to theft by deception without a finding that each had a purpose to deprive an owner of property. Beth Eyerman and Hodge also allege that the trial court compounded that error by defining the term "knowingly," as applied to theft with a lower intent standard that, by its terms, applies only to offenses charged under R.C. Chapter 1707.
A reviewing court will not reverse a conviction in a criminal case due to jury instructions unless it is found that the jury instructions amount to prejudicial error. State v. DeHass
(1967), 10 Ohio St.2d 230, paragraph two of the syllabus. Jury instructions should outline the issues, state the applicable principles of law, and clarify the jury's role in the case.Bahm v. Pittsburgh Lake Erie Rd. Co. (1966), 6 Ohio St.2d 192. A jury instruction is proper when it adequately informs the jury of the law. Linden v. Bates Truck Lines, Inc. (1982),4 Ohio App.3d 178. The trial court has the responsibility to give all jury instructions that are relevant and necessary for the jury to weigh the evidence and make findings of fact. SeeState v. Comen (1990), 50 Ohio St.3d 206, paragraph two of the syllabus; State v. Lessin (1993), 67 Ohio St.3d 487. The court is not required, however, to give requested instructions verbatim, so long as the instructions actually given contain a correct, pertinent statement of the law and are appropriate to the facts of the case. Id.
If appellants did not raise a timely objection with respect to a jury instruction, we must engage in a plain error analysis pursuant to Crim.R. 52(B). "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus. Our inquiry under a plain error standard is whether, but for the purportedly erroneous instruction, the outcome of the trial clearly would have been different. Long,
at paragraph two of the syllabus; State v. Underwood (1983),3 Ohio St.3d 12.
Here, appellants offered a general objection to the trial court's denial of each amendment to the instructions proposed by appellants. They also offered a general objection to each instruction given by the trial court, and they asked the trial court to adopt each suggestion and instruction offered by appellants. In addition, counsel for Hodge and Beth Eyerman specifically objected to the use of the definition of "knowingly" as set forth in R.C. 1707.29 with respect to the theft charges. Appellants tendered an instruction on purpose that provides in relevant part: "The second element of the offense requires proof beyond a reasonable doubt that [appellants] Robert D. Hodge, Jr. and Beth A. Eyerman acted 'with purpose' to deprive an owner of property." (Appellant's Jury Instructions at 44.) Appellants did not, however, specifically object to the theft instruction or the aiding and abetting instruction as given by the trial court. Nor did appellants proffer their own aiding and abetting instruction. Accordingly, we must address appellants' argument concerning the mental culpability requirement for aiding and abetting theft under a plain error analysis. Since appellants did specifically object to the trial court's "knowingly" instruction, we must determine whether the second definition of "knowingly" prejudicially impaired appellants' theory of the case.
The trial court gave the following instruction on theft:
 Before you can find a defendant guilty of any count of theft, you must find beyond a reasonable doubt that on or about the alleged date in the applicable count in the indictment, in Franklin County, Ohio, such defendant: (A) knowingly obtained or exerted control over property with the purpose to deprive the owner of such property by deception; or (B) knowingly aided or abetted another in committing the offense of theft; or (C) conspiring with another to commit the offense of theft.
Aid means to help, assist, or strengthen.
 Abet means to encourage, counsel, incite or assist.
 A person acts knowingly regardless of his purpose,
his or her purpose, when the person is aware that his or her conduct will probably cause a certain result or probably be of a certain nature. A person has knowledge of circumstances when he or she is aware that such circumstances probably exist. Since you cannot look into the mind of another, knowledge is determined from all the facts and circumstances in evidence. You will determine these facts and circumstances whether there existed at the time in the mind of the defendant an awareness of the probability that his or her acts would result in (a) obtaining or exerting control over the property of the owner, or (b) aiding and abetting another in committing the offense of theft.
 Property means any property, real or personal, tangible or intangible. Property includes money.
 For purposes of the counts charging theft, a person acts purposefully when it is his or her specific intention to cause a certain result. It must be established in this case at the time in question there was present in the mind of a defendant a specific intention to deprive the owner of such property by deception. [Emphasis added. Tr. 72 at 96-98.]
The state claims the aiding and abetting instruction was proper because it was taken almost verbatim from the Ohio Jury Instructions ("OJI") for complicity. See 4 Ohio Jury Instructions (1997), Section 523.03, at 400-401. In addition, the state claims part (B) of the instruction incorporates the purpose requirement for the offense of theft in part (A) by its reference to "committing the offense of theft." The state also claims that the trial court cured any alleged defect by giving an instruction on "purposely" in connection with the counts charging theft.
We reject the state's arguments for two reasons. First, the jury was not instructed that, in order to find each appellant guilty as an aider and abettor to theft by deception, it must find that each defendant had a purpose to deprive the owner of his or her property. Second, the trial court gave a second definition of "knowingly" that specifically negated the earlier definition of "knowingly" given in connection with the theft counts.
With respect to the theft counts, Beth Eyerman and Hodge were charged under the complicity statute, R.C. 2923.03. Under this statute, the requisite culpability for an accomplice must be the same as the culpability required for the underlying offense. State v. Rice (1995), 103 Ohio App.3d 388, 400. Theft by deception involves two culpable mental states: knowingly
obtaining or exerting control over property by deception with the purpose to deprive the owner of the property. R.C. 2923.32. Thus, appellants' purpose to deprive the investors of their property must be proven as an essential element of the crime of theft by deception, even where the prosecution proceeds on an aider and abettor theory.
Here, the trial court correctly instructed the jury on the mental elements necessary to commit the crime of theft by deception, but failed to properly instruct on the mental elements necessary for aiding and abetting. "Purposely" was defined, but only in the context of defining theft by a principal. "Purposely" was not defined in relation to aiding and abetting. The instruction offered by the state and given by the trial court also inserted an additional "knowingly" in part (B), the aiding and abetting instruction. While an accomplice to theft must "knowingly" assist another, in doing so, he or she must have the "purpose" of depriving the owner of property or services. The instruction as given indicated that the jury need only find appellants knowingly aided and abetted in the commission of a theft offense. The instruction did not state that purpose is also an element of aiding and abetting a theft offense. The jury could not have known from these instructions that an aider and abettor had to have the specific intention to deprive the owner of property.
Equally important, the trial court gave an erroneous instruction on "knowingly" that specifically and prejudicially undermined appellants' theory of the case. As quoted previously, the trial court first gave an appropriate instruction defining "knowingly" in the context of the theft offenses. The trial court then gave a second definition of "knowingly," as applied to theft, using the definition at R.C.1707.29, which is a lower intent standard that, by its terms, applies only to offenses charged under R.C. Chapter 1707. This second definition negated the earlier definition with respect to the theft offenses.
After giving the definition of "knowingly" as it related to theft, the trial court went on to state:
 I had previously described to you the meaning of knowingly in paragraph 74, and acting purposely in paragraphs 40 and 76. In connection with the counts charging knowingly making false representations and unregistered sales of securities, both under counts 194 through 200 and where listed as corrupt activities in counts 1 and 2, and theft charges, the defendant shall be deemed to have had knowledge of any matter of fact, where in the exercise of reasonable diligence, he or she should, prior to the alleged commission of the offense in question, have secured such knowledge.
[Emphasis added. Tr. 72 at 104.]
This instruction, offered by the state and given over Beth Eyerman's and Hodge's objections effectively negates the earlier definition given in connection with the theft by deception counts. Therefore, not only did the trial court fail to properly instruct on the mental elements necessary for aiding and abetting, the trial court also gave the wrong definition of "knowingly" for purposes of the theft counts.[4]
Under a plain error analysis, the question is whether the acts alleged to support the theft convictions are consistent only with a purposeful intent to deprive the owners of their property or whether appellants' conduct was consistent with a lesser mental state. State v. Cummings (Apr. 21, 1992), Franklin App. No. 90AP-1144, unreported (1992 Opinions 1577). In Cummings, the trial court failed to instruct the jury that a necessary element for convicting a person of complicity is the same culpability required for the commission of the offense. This amounted to plain error when appellant's behavior could have been consistent with lower levels of culpability than purposely. This court stated: "The elements of an offense must be expressly and explicitly defined in the charge. It is not sufficient that the jury may speculate from the charge that, in addition to the elements defined in the charge, an additional element is necessary for a conviction." Id. at 1594.
In State v. Twinam (Dec. 2, 1986), Franklin App. No. 86AP-341, unreported (1986 Opinions 3074), this court did not find plain error when the trial court incorrectly charged the jury on the subject of complicity, because we concluded that if the conduct attributed to the defendant (planning a burglary, encouraging juveniles to commit the burglary, and providing lunch meat to distract the victims' dogs) actually occurred, it was consistent only with the purpose to engage in a theft.
In this case, the state relied on the June 10, 1992 meeting as evidence that Beth Eyerman and Hodge had no intention of using the proceeds from the most recent offerings, Lifeline Shelter and Reitz Data, to exercise warrants, purchase shares, and deliver shares to the investors. Instead, the state argues that the projected income was allocated to pay other liabilities. Even with projected income of over $5 million, DSI's liabilities exceeded its expected revenues by more than $4 million.
However, Beth Eyerman and Hodge characterize the same June 10, 1992 meeting as supporting their theory of the case. The defense theory was that the state could not prove that Beth Eyerman and Hodge had the requisite mental culpability to deprive the investors of their money. Beth Eyerman was president of DSI for approximately five months and became president at the behest of her ill father, Red Eyerman. Beth Eyerman argued that she had admittedly walked into a company that was behind in meeting its obligations and that she was trying to see that DSI met those obligations. Through conversations with Hurd, Beth Eyerman learned that DSI could continue to operate despite its "impaired net capital" because it had posted a bond. (State's Exhibit 608.)
Beth Eyerman also presented evidence that she was not aware of the true financial condition of DSI. Former Chief Financial Officer Michael Carmichael had left DSI in March of 1992, believing its financial condition was hopeless. He did not, however, provide that information to Beth Eyerman. Beth Eyerman received her information from Carmichael's successor, Kohl, who was embezzling from the company and, therefore, had reason to conceal the true financial condition of DSI. On cross-examination, Kohl testified that he never told Beth Eyerman that DSI was insolvent and, in fact, had provided her with financial statements showing that DSI had a net worth of $13,584,000. At oral argument, the state conceded that there was no evidence in the record to show that Beth Eyerman knew that millions of dollars in receivables from DMI (mainly loans to Red Eyerman) were bogus. On cross-examination of the state's expert, Richard Clark testified that he spent over three hundred hours reviewing the financial records of DSI and DMI and that, without access to the records of DMI, someone could not determine that DSI was insolvent.
Hodge characterized the June 10th meeting as evidence that appellants knew that they needed to take action to insure DSI would be able to deliver the stocks it sold. The state's witness, Kohl, testified that the purpose of the June 10, 1992 meeting was to ask Red Eyerman "to control the amount of money that he was taking out of Dublin so that we could better project what needed to be done to get the company turned around."
Despite efforts to stop the flow of money out of DSI and to get the company out of debt by the end of the year, Red Eyerman continued to take money for himself. Thus, while Red Eyerman may have had the specific intent to deprive investors of their money, Beth Eyerman argued that she was merely trying to solve the cash shortage problem and satisfy all DSI's obligations. Similarly, Hodge argued that, in addition to his sales duties, he spent a great deal of time trying to get investors paid, but that he had no real authority to do so. All such payments had to go through Kohl and be approved by Red Eyerman.
As discussed in connection with the sufficiency argument, the evidence of the June 10th meeting could be seen to support the state's theory of theft by deception. However, appellants' actions are also consistent with the theory that appellants knew DSI had fallen behind in its payables because of insufficient cash, yet they had posted a bond and still intended for DSI to meet its obligations by the first of the year. Thus, the trial court's failure to instruct as to the proper mental culpability went to the heart of Beth Eyerman's and Hodge's case.
Under the instructions as given, however, the state merely had to prove that a principal, such as Red Eyerman, had the purpose to deprive investors of their money and that, if Hodge and Beth Eyerman even assisted in running the company, they could be found guilty as aiders and abettors. Thus, as discussed in Cummings, the trial court's failure to instruct as to the proper mental culpability amounts to plain error because the jury could have found Beth Eyerman and Hodge guilty of aiding and abetting theft by deception without making a finding as to an essential element of the offense. The jury was, in effect, instructed to find Beth Eyerman and Hodge guilty as accomplices regardless of whether it found they had the requisite purpose to deprive. This is particularly true given the second erroneous definition of "knowingly" given by the trial court. Under this definition, the jury could have found that Hodge and Beth Eyerman should have known that millions of dollars were being siphoned from the company and that Red Eyerman had no intention to repay the money. Under the instructions as given, the jury also could have found that Beth Eyerman and Hodge should have known that DSI was insolvent and incapable of meeting its obligations even if they instituted drastic cost-cutting measures. This was plain error and prejudiced the theory of appellants' case.
Consequently, Beth Eyerman's eighth and Hodge's eighth assignments of error are sustained with respect to the instruction as to the requirement necessary to find them guilty of aiding and abetting a theft offense.
V. CHALLENGES TO RICO COUNTS A. Sufficiency Challenges to Wire and Mail Fraud Predicate Offenses.
In her fifth assignment of error, Beth Eyerman also claims that the state failed to present sufficient evidence of wire or mail fraud to allow either crime to serve as a predicate offense supporting her RICO conviction.
In order to establish that Beth Eyerman violated the federal mail fraud statute, Section 1341, Title 18, U.S.Code,[5] the state was required to prove that she: (1) participated in a scheme to defraud; and (2) used the mail for the purpose of executing the scheme to defraud. United States v. Griffith (C.A.6, 1994),17 F.3d 865, 874; United States v. Landerman (C.A.5, 1997),109 F.3d 1053, 1066. The existence of a violation of the federal wire fraud statute, Section 1343, Title 18, U.S.Code,[6] required essentially the same proof, except that an interstate wire communication, rather than a mailing, must have been used for the purpose of executing the scheme to defraud. Griffith;Landerman. Once participation in a scheme to defraud is shown, it need not be shown that the particular defendant actually used the mails or interstate telephone lines, as the particular defendant is responsible for any foreseeable mail or interstate wire communication that took place in connection with the scheme. Griffith; Landerman.
Here, the evidence supporting Beth Eyerman's theft convictions is also sufficient to establish that she knowingly participated in a scheme to defraud investors after June 10, 1992. Evidence that the mails were used to further that scheme is abundant. The record reveals that DSI regularly sent sales confirmations and billing statements to investors who purchased stock over the phone. For example, Carolyn Johnson testified that, after she purchased two hundred shares of Aerospace Lubricants from DSI on September 2, 1992, over the telephone, she received a bill for the purchase price of those shares from DSI in the mail. (State's Exhibit 3591.) Similarly, Thomas Stonerock testified that, following his purchase of three hundred shares of Dewey's Candy Company in August 1992, he received a document from DSI confirming his purchase in the mail. (State's Exhibit 4731.)
With respect to wire fraud, the record is devoid of any evidence of interstate telephone calls or other electronic transactions which took place in connection with the scheme to defraud investors after June 10, 1992. Although the state has pointed generally to evidence in Hurd's billing records that indicates that Hurd or a member of his firm made interstate telephone calls that were billed to DSI, the exhibits do not disclose the recipient or content of these calls. As a result, a jury could not find that these calls were made in connection with the scheme to defraud. See Griffith.
The state presented sufficient evidence to permit federal mail fraud but not federal wire fraud to serve as a predicate offense supporting Beth Eyerman's RICO conviction. Consequently, Beth Eyerman's fifth assignment of error is overruled regarding her challenge to mail fraud, and is sustained regarding her challenge to wire fraud.
B. Legal Defects In Predicate Offenses.
Beth Eyerman, in her sixth assignment of error, Hurd, in his second assignment of error, and Hodge, in his seventh assignment of error, allege that their RICO convictions in violation of R.C. 2923.32 must be reversed because of legal defects in several of the underlying predicate offenses. We agree.
As pointed out by appellants, a RICO conviction requires a determination by the jury that the defendant committed two or more predicate offenses related to the affairs of the same enterprise. R.C. 2923.32 and 2923.31(E); see, also, State v.Schlosser (1997), 79 Ohio St.3d 329, 334. Here, each appellant was indicted on a single RICO count, and the jury was instructed as to the following predicate acts with respect to each appellant.
As to Eyerman, the jury was instructed as to the following predicate acts: eight counts of grand theft; forty-six counts of theft; one count of making false representations in regard to registering a security in violation of R.C. 1707.44(B)(1); twenty counts of selling unregistered securities in violation of R.C. 1707.44(C)(1); and, although not independently charged in the indictment, the commission of mail and wire fraud in violation of Sections 1341 and 1343, Title 18, U.S.Code.
As to Hurd, the jury was instructed as to the following predicate acts: three counts of making false representations in regard to registering a security in violation of R.C.1707.44(B)(1); and, although not independently charged in the indictment, the commission of mail and wire fraud in violation of Sections 1341 and 1343, Title 18, U.S.Code.
As to Hodge, the jury was instructed as to the following predicate acts: one count of aggravated theft; fifteen counts of grand theft; ninety-two counts of theft; and, although not independently charged in the indictment, the commission of mail and wire fraud in violation of Sections 1341 and 1343, Title 18, U.S.Code.
The trial court further instructed the jury that it could return a guilty verdict on the RICO counts if it found that each defendant committed any two of the predicate acts. Thus, appellants contend that the jury's general guilty verdict makes it impossible to determine upon which two predicate offenses the jury based their respective RICO convictions and, as such, their convictions must be reversed because it is possible the jury found them guilty on an improper basis.
In support of their position, appellants cite the Eighth Appellate District's decision in State v. Johnson (1952), 64 Ohio Law Abs. 425, 430. In Johnson, the court stated that "the two issue rule ha[d] no application in criminal cases." The "two-issue" rule provides that: "[w]here a general verdict is returned for one of the parties, and the mental processes of the jury are not tested by special interrogatories to indicate which issue was determinative of the verdict, it will be presumed that all issues were resolved in favor of the prevailing party, and, where a single determinative issue has been presented free from error, error in presenting another issue will be disregarded." Centrello v. Basky (1955), 164 Ohio St. 41, paragraph four of the syllabus; H.E. Culbertson Co. v.Warden (1931), 123 Ohio St. 297, 303; Yoder v. Stocker SitlerOil Co. (Feb. 26, 1996), Holmes App. No. 507, unreported. Thus, if (as appellants contend) the "two-issue" rule does not apply in criminal cases, legal error in any one of the alternative predicate offenses instructed to the jury would necessitate the reversal of appellants' RICO convictions here.
In opposition, the state contends that the two-issue rule does apply to appellants' RICO convictions. In so doing, the state principally relies on Griffin v. United States (1991),502 U.S. 46, 112 S.Ct. 466, for the proposition that, when a jury returns a general verdict in an indictment when a number of predicate acts are charged in the alternative, the verdict should be upheld if the evidence is legally sufficient as to any one of the possible grounds for conviction. The state's reliance on Griffin, however, is misplaced.
In Griffin, the defendant was indicted (with two other defendants) as having conspired to defraud a government agency. The unlawful conspiracy was alleged to have had two objects: (1) to defraud the IRS; and (2) to defraud the DEA. At trial, evidence was introduced implicating all three defendants of conspiring to defraud the IRS, but no evidence was introduced to implicate the defendant with the conspiracy to defraud the DEA. Nonetheless, the trial court instructed the jury that it could return a guilty verdict against the defendant if it found her to have participated in either one of the two objects of the conspiracy. The jury found the defendant guilty of conspiracy. On appeal, and in her petition to the United States Supreme Court, the defendant argued (like appellants here) that her conspiracy conviction must be overturned since it was possible that the jury returned such a verdict on an invalid basis, i.e., the factually unsupported allegation of conspiring to defraud the DEA.
The court of appeals and the United States Supreme Court rejected the defendant's argument and affirmed her convictions. In rejecting the defendant's argument, the United States Supreme Court specifically held that a general verdict based upon multiple possible predicate acts will not be reversed simply because the evidence was factually insufficient to support one or more (but less than all) of the possible predicate acts instructed. In so doing, however, the court distinguished between those cases in which the evidence was merely factually insufficient to support one of the predicate acts from those cases in which there was a legal error in submitting a predicate act to the jury. Such a distinction, noted the court, was consistent with the role of a jury in a criminal trial:
 * * * Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law — whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence. [Emphasis added. Id. at 59, 112 S.Ct. at 474.]
Thus, pursuant to Griffin, a general verdict must be reversed if it may have been based upon legal error in one of the underlying predicate acts going to the jury. See, e.g.,United States v. Palazzolo (C.A.6, 1995), 71 F.3d 1233, 1236-1238
(under Griffin, general conspiracy verdict must be reversed where trial court erroneously stated government's burden of proof with respect to one of the three predicate acts because it was possible that the jury rendered a verdict based upon the improper instruction).
The cases cited by the state in which RICO convictions are upheld because the evidence was otherwise sufficient as to at least two underlying predicate acts, are not to the contrary. First, in some of these cases, the defendants (like the defendant in Griffin) merely challenged the validity of the underlying predicate offense on factual sufficiency grounds, not legal grounds. See United States v. Vastola (C.A.3, 1993),989 F.2d 1318; United States v. Eisen (C.A.2, 1992),974 F.2d 246. Thus, consistent with Griffin, the general RICO verdicts in such cases were upheld because there was sufficient evidence on at least two of the predicate acts alleged. In the other cases, the RICO conviction was upheld because, even though some of the underlying predicate offenses contained legal errors, the jury otherwise convicted the defendant on separately charged underlying predicate offenses containing no error. SeeUnited States v. Angiulo (C.A.1, 1990), 897 F.2d 1169; Brennanv. United States (C.A.2, 1989), 867 F.2d 111. Thus, the jury verdicts operated as a special verdict, and the appellate court was not left to merely speculate as to the grounds for the RICO verdict.
Here, all three of appellants' RICO convictions must be reversed. As held above, all of the separately charged predicate offenses alleged in the RICO counts have been reversed based upon errors of law. The alleged violations of R.C. 1707.44(B)(1) were sent to the jury under an improper interpretation of that statute; the alleged violations of R.C.1707.44(C)(1) were sent to the jury under an improper retroactive definition of "issued and outstanding," and the complicity theft instructions were erroneous. Thus, the only valid basis upon which the RICO convictions could be upheld is that the jury based its decision on the uncharged predicate offenses of mail and wire fraud. However, absent jury interrogatories or separate guilty verdicts as to the mail and wire fraud offenses, we cannot, consistent withGriffin and the other cases discussed above, uphold the RICO convictions on the mere possibility that the jury based its verdict on such grounds. In so holding, we also reject the state's contention that the jury must have based Hurd's RICO verdicts on the uncharged wire and mail fraud predicate acts because the jury signed the RICO verdict form and one of the false representation counts on November 28, 1995, but did not sign the other two false representation counts until December 11, 1995. The state cites no authority for this contention, and we will not engage in the speculation that the date on the verdict form somehow reveals the jury's mental process of deciding the RICO count.
Consequently, Beth Eyerman's sixth, Hurd's second, and Hodge's seventh assignments of error are sustained.
VI. SUMMARY
Our resolution of Hurd's first and second assignments of error; Beth Eyerman's second, fourth, fifth, sixth and eighth assignments of error; and Hodge's fifth, seventh and eighth assignments of error requires the reversal of all appellants' convictions, and renders appellants' remaining assignments of error moot.
On remand, Hurd must be acquitted on Counts 194, 195 and 196 charging him with making false statements in connection with the registration of securities by description, but may be retried on Count 2 charging him with violation of the RICO statute.
Beth Eyerman must be acquitted on Count 199 charging her with making false statements in connection with the registration of securities by description. However, she may be retried on Counts 319, 320, 324 and 326 charging her with the sale of unregistered securities; Count 2 charging her with violation of the RICO statute; Counts 28, 29, 31 and 32 charging her with grand theft; and Counts 119, 120, 121, 128, 129, 130, 132, 133, 134, 135, 137, 138, 139, 143, 144, 147, 152, 153, 154, 158, 159, 162, 164, 165, 167, 168, 169, 171, 174, 176, 178, 180, 189 and 190 charging her with theft. Hodge must be acquitted on Count 3 charging him with aggravated theft; Counts 6, 12, 13, 14, 15 and 16 charging him with grand theft; and Counts 35, 36, 37, 38, 39, 42, 44, 45, 46, 47, 49, 50, 51, 53, 54, 55, 58, 59, 60, 62, 65, 66, 69, 72, 73, 75, 76, 77, 78, 79, 81, 82, 85, 86, 88, 89, 90, 92, 93, 94 and 95 charging him with theft. Hodge, however, may be retried on Counts 19, 24, 26, 27, 28, 29, 31 and 32 charging him with grand theft, and Counts 34, 96, 97, 102, 104, 105, 106, 108, 109, 110, 112, 113, 114, 116, 118, 119, 120, 121, 122, 128, 129, 130, 132, 133, 134, 135, 137, 138, 139, 143, 144, 147, 152, 153, 154, 158, 159, 162, 164, 165, 167, 168, 169, 171, 174, 176, 178, 180, 189 and 190 charging him with theft.
Judgments reversed and remanded.
LAZARUS, P.J., BOWMAN and DESHLER, JJ., concur.
[1] The term "Ponzi scheme" arises out of the remarkable criminal financial career of Charles Ponzi. In December 1919, with $150, he began the business of borrowing money on his promissory notes. He did not profess to receive money for investment for account of the lender. He borrowed the money on his credit only. He spread the false tale that, on his own account, he was engaged in buying international postal coupons in foreign countries and selling them in other countries at one hundred percent profit, and that this was made possible by the excessive differences in the rates of exchange following the war. Ponzi induced thousands to lend to him by promising in ninety days to pay them $150 for every $100 loaned. Within eight months he took in $9,582,000, for which he issued notes for $14,374,000. He paid his agents a commission of ten percent. He was always insolvent, and made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes. By the time his scheme collapsed, Ponzi was taking in about $1,000,000 a week.Cunningham v. Brown (1924), 265 U.S. 1, 44 S.Ct. 424-425.
[2] After the dates alleged in the indictment, the General Assembly passed a nonsubstantive amendment to the language of R.C. 1707.44(B)(1) to read:
 Complying with this chapter, in regard to registering securities by description[.]
[3] Beth Eyerman and Hodge were charged with theft pursuant to R.C. 2923.03(A), which provides, as follows:
 (A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
* * *
(2) Aid or abet another in committing the offense[.]
[4] In closing argument, the state declared that this latter definition of knowingly applied only to the securities counts and not to the theft, conspiracy, or RICO charges. Yet inexplicably, the instruction tendered to the trial court had the definition applying to the theft charges.
[5] Section 1341, Title 18, U.S. Code provides as follows:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing, whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.
[6] Section 1343, Title 18, U.S. Code provides as follows:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.
 APPENDIX DWIGHT I. HURD'S ASSIGNMENTS OF ERROR:
1. "The evidence of registration of transactions by description is insufficient as a matter of law to support a conviction under Counts 194, 195, and 196 of the indictment, which concern the registration of securities by description."
2. "Appellant's conviction on Count 2 for engaging in a pattern of corrupt activity (RICO) must be reversed because of legal defects in his convictions on Counts 194, 195, and 196."
3. "The trial court erred when it deviated from both the indictment and the Ohio Revised Code and incorrectly instructed the jury that it could convict appellant on Counts 2, 194, 195, and 196 for making false representations in violation of R.C.1707.44(B)(1) in regard to registering 'the sale of securities by description."
4. "The trial court erred by refusing to instruct the jury that Appellant could be found guilty on Count 2 only if he participated in the actual operation or management of the RICO enterprise."
5. "Appellant's convictions violate R.C. 1707.431."
6. "The trial court repeatedly abused its discretion in allowing the State to present expert testimony in contravention of established Ohio law."
7. "The trial court erred in allowing State's non-expert witnesses Dennis Belli and David Caldwell to provide expert securities law testimony."
8. "The trial court erred repeatedly in allowing the State to elicit from its witnesses the hearsay of unidentified Dublin employees."
9. "The trial court erred when it allowed the State to present evidence of alleged omissions and/or non-disclosure of material facts."
10. "The trial court abused its discretion by admitting summary evidence through prosecution witness Richard Clark without foundation."
11. "The prosecution's willful discovery abuses and belated production of exculpatory material unfairly prejudiced the defense."
12. "The convictions on Counts 2 and 194-196 should be reversed, because the activity there complained of by the state was previously condoned by the State, rendering the statutes at issue void for vagueness."
13. "R.C. 1707.45, which places the burden of proof upon a criminal defendant charged under R.C. 1707.44, is unconstitutional."
14. "The trial court failed to ensure that the jury was selected in conformity with the Equal Protection Clause of theFourteenth Amendment."
15. "Appellant's Fifth Amendment rights were violated by comments of the trial court and the prosecutor."
16. "The trial court erred in admitting into evidence the records of the Emens, Hurd, Kegler Ritter law firm without requiring the State to make a showing of relevance or presenting appropriate foundation."
17. "Judge Ammer abused his discretion in reversing Judge Cox's order granting severance."
18. "The cumulative effect of the multiple errors constitutes prejudicial error."
 ROBERT D. HODGE, JR.'S ASSIGNMENTS OF ERROR:
1. "The appellant and certain jurors were denied equal protection of the laws under the Fourteenth Amendment to the United States Constitution by the trial court's refusal to conduct a Batson hearing after the state systematically excluded prospective jurors solely because of their race and gender."
2. "The trial court repeatedly and incorrectly introduced hearsay testimony under the Rule 801(D)(2)(e) exception to hearsay when it was clear that the state had not demonstrated that the admitted testimony was made by a purported co-conspirator in furtherance of the conspiracy in violation of the 6th and 14th Amendments."
3. "The state's repeated and willful discovery violations throughout the trial prejudiced the appellants' ability to properly prepare for a defense of the accusations against them because foreknowledge of exculpatory evidence would have greatly improved their ability to prepare for trial."
4. "The trial court abused its discretion by admitting summary evidence through prosecution witness Richard Clark without foundation."
5. "The defendant-appellant was denied due process and a fair trial under Section 10, Article I, Ohio Constitution and under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution as there was insufficient evidence to support the convictions for theft by deception and such convictions were against the manifest weight of the evidence."
6. "All counts as to appellant must be reversed by this court because the court charged the jury over appellant's objection as to O.R.C. § 2901.24 which was not part of the original indictment and requires a different showing of proof. Therefore it denied appellant his right to an indictment from a grand jury as to the charges against him and also denied appellant an opportunity to defend himself, in violation of the Sixth andFourteenth Amendments to the United States Constitution."
7. "Appellant's Count 2 conviction for engaging in a pattern of corrupt activity must be overturned as a matter of law because the predicate offenses of theft must be overturned."
8. "The court committed plain and prejudicial error by improperly defining in the jury instructions the level of culpability necessary to find appellant aided or abetted in the commission of a theft."
9. "The court erred in presenting the jury with misleading and confusing instructions, unreasonably denying requests to list the charges separately with specificity."
10. "The appellant's 5th Amendment rights were violated by repeated prejudicial comments from both the trial court and the special prosecutors."
11. "The trial court erred in allowing unqualified, non-experts to give expert testimony."
12. "The trial court repeatedly abused its discretion in allowing the state to present expert testimony in contravention of state law under State v. Walsh."
13. "The multiple erroneous evidentiary rulings by the trial judge, when combined with his numerous errors in instructing the jury, clearly constitute prejudicial, reversible error."
 BETH A. EYERMAN'S ASSIGNMENTS OF ERROR:
1. "The trial court failed to ensure that the jury was selected in conformity with the Equal Protection Clause of theFourteenth Amendment."
2. "Criminally prosecuting Beth Eyerman for the sale of unregistered securities violated her due process rights."
3. "The trial court abused its discretion by admitting summary evidence through prosecution witness Richard Clark without foundation."
4. "There was no evidence to support the jury's conviction of Beth Eyerman for making false representations for the purpose of registering securities, Count 199."
5. "The state failed to prove the counts of theft by deception and the mail and wire fraud allegations of Count 2 against Beth Eyerman."
6. "Beth Eyerman's conviction for engaging in a pattern of corrupt activity (Count 2) cannot stand because her convictions of the predicate offenses upon which that count was based cannot stand."
7. "The prosecution's willful discovery abuse and belated production of exculpatory material unfairly prejudiced Beth Eyerman's defense."
8. "The trial court erred in instructing the jury that proof of intent in connection with aiding and abetting a theft conviction was to be judged by a knowingly standard and then proceeding to instruct the jury that the knowingly standard that applied was the one articulated at R.C. 1707.29 and in refusing to provide the jury with separate written instructions for each of the distinct offenses charged."
9. "The trial court erred when it deviated from both the indictment and the Ohio Revised Code by instructing the jury that it could convict Beth Eyerman on Count 199 for making false representations in violation of R.C. 1707.44(B)(1) in regard to registering 'the sale of securities by description."
10. "The trial court repeatedly abused its discretion in allowing the state to present expert testimony in contravention of established Ohio law."
11. "The trial court erred in allowing non-expert witnesses Dennis Belli and David Caldwell to give expert opinion testimony."
12. "The trial court erred repeatedly in allowing hearsay statements by Dublin employees."
13. "Beth Eyerman's Fifth Amendment rights were violated by comments of the trial court and prosecutors."